**YELLOW TRANSIT FREIGHT LINES, INC., East Texas Motor Freight Lines, Inc., and Red Ball Motor Freight, Inc., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Herrin Transportation Co., and Central Freight Lines, Inc., Intervening Defendants.**

**Civ. No. 9247.**

United States District Court
N. D. Texas,
Dallas Division.
July 15, 1963.

Hughes, J., dissented.

Swanson, Midgley, Jones, Blackmar & Eager, Kansas City, Mo., Rice, Carpenter & Carraway, Washington, D. C., Callaway, Reed, Kidwell & Brooks, by Rollo E. Kidwell, Charles D. Mathews, Dallas, Tex., for plaintiffs.

Phillip Robinson, of James, Robinson & Starnes, Austin, Tex., and Ralph W. Pulley, Jr., of Phinney, Hallman & Pulley, Dallas, Tex., for defendants Herrin Transportation & Central Freight Lines.

John H. D. Wigger, Justice Dept., Lee Loevinger, Asst. Atty. Gen., Washington, D. C., and Barefoot Sanders, U. S. Atty., Dallas, Tex., for defendants United States and I. C. C.

Walter Caven and Charles L. Ford, Jr., Austin, Tex., for intervenors Missouri Pacific R. R. & Southern Pacific Co.

Before BROWN, Circuit Judge, and DAVIDSON and HUGHES, District Judges.

PER CURIAM.

For reasons separately stated, Judges Brown and Davidson join in an order setting aside the order of the Interstate Commerce Commission and remanding the case for further and not inconsistent proceedings. Judge Hughes for reasons set forth in her dissenting opinion would uphold the order and dismiss the complaint. The Court is in full agreement, however, that since a remand is ordered, the Court does not undertake to impose any restrictions on the nature or kind of proceedings to be conducted by the Commission. Within the sound discretion of the Commission, that is a matter for its initial determination.

DAVIDSON, District Judge.

The cities of Beaumont and Orange, Texas, are located in the southeastern corner of the State and within about 16 miles of each other.

This suit arises by virtue of a ruling of the Interstate Commerce Commission against the action of the complainant shippers serving Beaumont, Texas. The intervenors are shippers who were entitled to operate out of Orange, Texas.

The conflict of interest and the controversy before us grows out of an action on the part of the City of Orange in annexing apparently a large area of the territory between itself and Beaumont. The ordinance of annexation describes and encircles a large acreage of land of many square miles as part of the city and by the peculiar wording of the ordinance it doesn't annex all the land in that area. The land actually annexed might be called a roadway or fence, as it were, encircling the land enclosed next to the City of Orange without annexing the land itself by the annexation of a strip or roadway being only comparatively a few feet in width. The ordinance of annexation, however, declares that the annexing the strip in question subjects the same to all purposes as a part of the City of Orange.

This circular strip reaches within five miles of the City of Beaumont. Now the City of Beaumont has over 100,000 population and under the previous regulations made by the Interstate Commerce Commission a city of 100,000 population automatically takes jurisdiction for transportation purposes of a belt line reaching five miles outside its corporate limits. This five-mile limit of Beaumont is overlapped by the circular strip annexed by Orange. Thus, a part of Orange comes within the service of the trucking companies operating out of Beaumont and it is insisted, and seemingly not to be questioned, gives the Beaumont shippers

right to serve all of the Orange territory, including the various parts of the city.

A more detailed statement of the controversy will be found in the dissenting opinion of Judge Sarah Hughes.

The ruling of the Interstate Commerce Commission in effect says that the ordinance of the municipality doesn't accomplish all that it says and the ruling of the Commission undertakes to limit the effect of the ordinance which has the effect of raising a question. Does the Interstate Commerce Commission as such have the power to determine the meaning of a legislative body of a State or municipality when such municipality itself undertakes to define the meaning and extent of the powers of such ordinance?

By its own regulations, 49 CFR § 170.15, the Interstate Commerce Commission has defined municipality as:

"* * * any city, town, village or borough which has been created by special legislative act or which has been otherwise individually incorporated or chartered pursuant to general state laws, or which is recognized as such under the constitution or by the laws of the state in which located and which has a local government. It does not include a town or township of the New England type."

The Orange ordinance of annexation as above stated declares that the annexation is made for all purposes. The ruling of the Interstate Commerce Commission challenges the effect of such declaration.

The pertinent part of the annexation ordinance of Orange reads as follows:

"AN ORDINANCE OF THE CITY OF ORANGE, TEXAS, A MUNICIPAL CORPORATION, ANNEXING CERTAIN TERRITORY * * *
* * * * * *
"WHEREAS, the City of Orange and the area surrounding and adjacent to the City of Orange is growing in population and residential, commercial and industrial development very rapidly * * * and

"WHEREAS, the waterways of Orange County are extensively used for boating and other recreational purposes, and such uses should be subjected to control by a responsible governmental unit with the police power and facilities to control violations of existing laws and regulations * * *

"* * * now therefore,

"BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF ORANGE, TEXAS:

"That the land, area, territory and waterways hereinafter described in Exhibit "A", attached hereto and made a part hereof *for all purposes*, be, and the same are hereby annexed to and made a part of the City of Orange for all municipal purposes, and the same shall, after the passage of this ordinance on final reading, *be a part* of the *City* of *Orange and be included within the boundaries thereof.* (Emphasis supplied)
* * * * * *

"PASSED, APPROVED AND ADOPTED ON FINAL READING on this the 9th day of August, A. D. 1960."

For the convenience and understanding as well as the benefit of shippers carrying a permit of convenience and necessity of service the Interstate Commerce Commission has heretofore outlined certain rules. In outlining these rules it acted in a quasi-legislative capacity and shippers coming under that rule have a right to expect that that rule will be observed, and if in the particular case it is not observed, the later ruling becomes retroactive in its nature.

The pertinent part of the ruling of the Interstate Commerce Commission in Ex Parte No. MC–37 Commercial Zones and Terminal Areas, 46 M.C.C. 665, is as follows:

"The commercial zone of each municipality in the United States, * * * (except those individually

determined) consists of * * * all other municipalities within the United States and all unincorporated areas within the United States which are adjacent to the base municipality as follows: (a) When the base municipality has a population less than 2,500, all unincorporated areas within 2 miles of its corporate limits and all of any other municipality any part of which is within 2 miles of the corporate limits of the base municipality; (b) when the base municipality has a population of 2,500, but less than 25,000, all unincorporated areas within 3 miles of its corporate limits and all of any other municipality any part of which is within 3 miles of the corporate limits of the base municipality; (c) when the base municipality has a population of 25,000, but less than 100,000, all unincorporated areas within 4 miles of the corporate limits of the base municipality; and (d) when the base municipality has a population of 100,000 or more, all unincorporated areas within 5 miles of its corporate limits * * *"

We think that the Interstate Commerce Commission is without power to set aside an ordinance of a municipality by saying that it doesn't mean what the ordinance itself declares itself to be.

It should not in this individual instance set aside its former rulings, because such takes on the nature of a retroactive proceeding which may work a hardship on those affected. We feel that the ruling of the Interstate Commerce Commission should not be sustained. It may be true that the City of Orange has equities present and potential, but we feel that it has within its own power and grasp a means of solving the problem before it to its satisfaction and to the satisfaction of its own shippers by amending its ordinance so it will not reach into the five-mile boundaries of Beaumont and neighboring cities.

We adopt and attach hereto Exhibit C used by the Interstate Commerce Commission.

It may be insisted that the City of Orange in establishing its far-flung circuit involved in this annexation was acting in an oppressive, capricious manner and that the ordinance is void for that reason, but the question immediately arises, can any authority other than a duly constituted court so rule or hold. Is it in the purview of the jurisdiction of the Interstate Commerce Commission to hold as a matter of law or to establish a precedent to the effect that it may by its decisions alter the boundaries of a city which it deems to have been established by an unwise, capricious act?

Allowing our thought to stray as it were from the record before us, in the light of the Roadway Express case involving an ordinance of the City of Houston, a narrow strip of land was held to be properly annexed as a part of the city.

And passing outside of the record it is a matter of common knowledge that the City of Fort Worth has annexed a strip some 15 miles in length in order to police Amon Carter Airport. Everybody is willing to see it policed and if Fort Worth is willing to do it nobody up to now has attacked the protection of Fort Worth as being capricious or otherwise. Dallas and Fort Worth have had disagreements about that field. The Civil Aeronautics Board has again and again passed upon the situation at the Amon Carter Field. Conflicts have arisen between parties affecting such and the service rendered by such, but up to now no attack has been made on Fort Worth's protection over the long strip connecting the field with the City of Fort Worth.

To concur in or affirm the Interstate Commerce Commission in the current case would be apparently overruling the decision heretofore made in the Houston case and laying a predicate for questioning of Fort Worth's jurisdiction over the strip up there.

If the Interstate Commerce Commission can determine the correct boundaries of Orange, she must do it as a court or hold that they are arbitrary and capricious and when she takes upon herself

the judicial power of exercising such, in our judgment, she extends that power beyond any that has been heretofore conferred upon her by Congress.

Incidentally, while the law recognizes a direct attack on a capricious annexation ordinance, no collateral attack such as is present in this case would be sustained.

We think the ruling of the Interstate Commerce Commission should be set aside without prejudice to any future action to be had within the law.

JOHN R. BROWN, Circuit Judge (concurring).

To constitute a majority, I join with Judge Davidson in setting aside the order of the Commission. In doing so, however, I adopt, as did he, the detailed and able opinion of Judge Hughes in the outline of the case, the geographical facts, and the statement of the issues and the controlling statutes and regulations. I differ as to each opinion. Judge Davidson, in effect, looks upon it in terms of the power of the ICC to override a valid municipal ordinance of the City of Orange, Texas. Judge Hughes considers that since it is a statute the ICC is expounding, it has the right (if not the duty) to do so regardless of its own outstanding and clearly applicable administrative regulations.

Since the term "commercial zone" ties into "municipality," the latter term is subject to interpretation. Charged as it is with the duty of administering the Transportation Act, the ICC had two principal ways to go about this. First, it could adjudicate each and every case and by a series of ad hoc decisions hammer out a sensible, workable standard. Or second, it could by following the requirements of the Administrative Procedure Act covering rule-making, establish administrative regulations defining in greater detail the meaning of "municipality" as used in the basic statute.

For very obviously practical reasons, the Commission essentially chose the second course. In very precise terms, so far as applicable to our case, it prescribed specifically what a "municipality" is:

" * * * any city, * * * which has been created by special legislative act or which has been, otherwise, individually incorporated or chartered pursuant to general State laws, or which is recognized as such, under the Constitution or by the laws of the State in which located, and which has a local government. It does not include a town of the township or New England type." 49 C.F.R. 170.15

Although this boundary strip annexation by the City of Orange is an obvious piece of land-grabbing gerrymandering of a kind typical of the post-war response by municipalities to the population explosion's threat of being hemmed in by satellite communities, it is categorically conceded on this record to be a valid legislative act under the laws of Texas. More precisely, it is conceded that under Texas law, this incorporation is valid for all purposes. This brings it within § 170.15 as a " * * * city * * * which is recognized as such, under the * * * laws of the State in which located * * *."

Of course Judge Hughes is correct in stating that the Commission cannot by an invalid regulation partially repeal an Act of Congress. The ICC certainly has the right—indeed the duty—to rescind its regulation either in a rule-making proceeding or an adjudicative proceeding when and as it concludes that the regulation is invalid. But the ICC has not done that here, nor has the Government in its behalf in arguments and brief before us even remotely suggested that the regulation as now promulgated is invalid. What the ICC has done, and what the Attorney General in its behalf asserts can be done, is to ignore the regulation because applying it produces an absurd result.

That brings us to the very vitals of this case. This transcends the very limited importance of the case to the parties in terms of this precise and unusual geographical situation. It demonstrates, indeed, one of the vices which led to the

long but successful struggle for the enactment of the Administrative Procedure Act. The citizen dealing with a governmental agency is entitled to know. He is entitled to know what the standards are where the agency presumes to promulgate administrative regulations. He is entitled to know in advance of their promulgation so that he or his interest may be heard. Nor are these regulations to be changed willy-nilly without some notice of a proposal to do so.

I share Judge Hughes' views that the promulgation of a regulation does not absolve the ICC of its duty to interpret both the statute and the regulation enacted by it as an implementation. In many cases there will be seen in this specific situation the need for interpretation. This would include such subordinate elements in § 170.15 as "recognized as such" city, etc. It might also drive the Commission to a decision that the regulation so framed is so contrary to the obvious intention of Congress in the organic statute, that the regulation can no longer be applied. But in that event, it does absolute violence to the whole theory of the APA if, finding the regulation invalid, the Commission may then ad hoc in an adjudicatory proceeding hold that a carrier is engaged in violation of the law because of conduct permissible under the regulation as promulgated.

It is one thing to interpret the regulation. It is quite another to *ignore* it. The Commission can hardly have it both ways—(1) a statute which makes the act illegal, and (2) a regulation which recognizes its legality.

I am not concerned with this merely from the standpoint of labels—i. e., adjudicatory or rule-making. My anxiety is more basic. As long as the definition of "municipality" under § 170.15 stands, the complaining Carriers have the right to serve the additional territory brought about by the expansion of the corporate limits of Orange, Texas. Having the *right* to do so, they also have the *duty* to do so. For each is a regulated, certificated common carrier having awesome statutory obligations to serve all those tendering freight for transportation at tariff charges from its respective termini. That includes, of course, the "terminals" as legislatively defined and as expanded by regulation.

Perhaps even more important, it does not stop at the relationship between each carrier and the shipping public. By virtue of this outstanding regulation and its implied inclusion of the added territory of Orange, the Carriers have an obligation to promulgate and file tariffs. These must, of course, include through and joint rates for the necessary exchange of traffic. Following the practice in the shipping industry, these tariffs are promulgated by various tariff agents who, along with the subscribing carriers, have a limited antitrust immunity from both civil and criminal prosecution at the hands of the United States Government. But this immunity is coextensive with the valid scope of service. The carrier is therefore put in an awful dilemma. He must accept all freight tendered for movement to and from the terminals as thus expanded or subject himself to penalties at the hands of the ICC. To accept freight as tendered, the carrier must, of course, promulgate tariffs. To promulgate tariffs, he must join with others and if, while joining with others in the promulgation of tariffs, it does so as to points beyond the scope of its operating authority, it has in the baldest form undertaken to fix prices. Fixing prices in interstate commerce between competitors constitutes—it is an understatement to say—antitrust violations per se.

The Commission's counsel on argument characterized these fears as artificial since, with the judgment and discretion invested in both the Commission and the Attorney General, it is not likely that either of these two agencies would institute civil or criminal prosecution growing out of such confusion. I readily accept the proposition that each of these agencies would carefully consider what ought to be done as each, in its own lights, saw the "public interest." But this confidence is hardly enough to carry the day. It

leaves the citizen—the object of congressional protection in the APA—in the uncertain position of not knowing just when or how or what governmental agency would strike. And for that, he would have a good deal of historical precedent. For all must recognize now that probably in no other area has there been such open, deep-seated conflict in approach as between the Department of Justice and various administrative agencies of the Federal Government as has been true in cases arising under the Interstate Commerce Act. And certainly this is true in those areas where—as is so often the case and as would be true here—the specter of antitrust comes into view. It is a common occurrence in three-judge cases reviewing ICC decisions for the General Counsel of the Commission to be in the awkward position of attempting to sustain an order which is vigorously attacked by the Attorney General. On other occasions it becomes a multi-party Donnybrook when, for example, the Department of Agriculture in the interest of farmers takes a position, say, in between these other two formidable adversaries.

The citizen ought not to be exposed to this sort of judicial peril. The citizen is entitled to rely upon the regulation until it is set aside or declared by court or administrative agency to be invalid. This regulation has not yet been declared invalid. It has been ignored. It covers precisely the situation presented, and so long as it stands, these Carriers are entitled to the benefit of it. If the result does not make sense, then it is because the regulation does not make sense.

I therefore join in an order which sets aside the order of the Commission. I do not undertake to prescribe just how or in what manner the Commission should further proceed since the case will be remanded to it for further and not inconsistent proceedings.

HUGHES, District Judge (dissenting).

This action is brought pursuant to sections 1336, 1398, 2284 and 2321–2325 of Title 28 U.S.C. Plaintiffs seek to set aside and annul an Interstate Commerce Commission order, issued June 26, 1962, whereby plaintiffs were directed to cease and desist motor carrier operations in interstate commerce to certain points beyond the scope of their operating authorities in violation of Section 206 of the Interstate Commerce Act, 49 U.S.C. § 306. Plaintiffs complain that in an adjudicatory proceeding the Commission departed from and modified existing rules formulated in a rule making proceeding without notice thereof and with retroactive effect in violation of the federal Constitution, the Administrative Procedure Act, and the Interstate Commerce Act.

A complaint proceeding before the Commission was initiated by Central Freight Lines, Inc., of Waco, Texas, Herrin Transportation Company of Houston, Texas, New Orleans Railroad Company of Houston, Texas, and Missouri Pacific Lines of St. Louis, Missouri, hereinafter called Central, Herrin, New Orleans Railroad and Missouri Pacific, alleging that East Texas Motor Freight Lines, Inc., of Dallas, Texas, Yellow Transit Freight Lines, Inc., of Kansas City, Mo., Red Ball Motor Freight Inc., of Dallas and Mercury Freight Lines, Inc., of Mobile, Ala., hereinafter called East Texas, Yellow Transit, Red Ball and Mercury, were unlawfully serving the city of Orange and other points in Orange County, Texas.

East Texas, Yellow Transit and Red Ball, plaintiffs, and Mercury, not a party herein, are regular-route motor common carriers. East Texas and Red Ball are authorized to serve Beaumont, Port Arthur, Port Neches, Groves and Nederland, Texas, while Yellow Transit and Mercury are only authorized to serve Beaumont; none is directly authorized by its certificate to serve the city of Orange.

The question of the scope of authority granted by Plaintiffs' certificates is dependent on whether any part of the City of Orange is within the commercial zone of the respective base municipality or

municipalities of plaintiffs; viz., within the commercial zones of Beaumont, Port Arthur, Port Neches, Groves and Nederland.

This determination requires a statement of the factual stiuation with reference to the cities involved. Orange County is located in eastern Texas and is bounded on the east by the Texas-Louisiana State Line at the center of the Sabine River; on the south and southwest it borders Jefferson County at the center of the Neches River. The city of Orange, located wholly within and at the eastern boundary of Orange County, is an incorporated municipality with a population of 25,605. Contiguous to and lying generally on the west side of the city are the two municipalities of Pinehurst and West Orange, Texas. By ordinances enacted August 9 and September 13, 1960, the city of Orange annexed a narrow semicircular strip of land consisting of certain roads, highways, right-of-ways and waterways, 13 miles in its east-west dimension and approximately 10 miles in its north-south dimension, enclosing almost the entire southern half of Orange County. The area enclosed within the annexed semicircular strip, but not itself annexed, consists of 130 square miles and includes Pinehurst, West Orange, and a large unincorporated area. The strip extends westward from the northwestern limits of Orange along the right-of-way of U. S. Highway 90, thence south along the right-of-way of Terry Road, thence west and southwest along the rights-of-way of F. M. Road No. 35 and Old Mansfield Ferry Road, thence south in a strip lying parallel and adjacent to the municipal limits of Beaumont to the Neches River, thence southeast over a strip half the width of the Neches River (from center to low water mark) to the Sabine River, and thence north over a similar strip along the Sabine River to the southeast corner of the municipal limits of Orange.

According to the 1960 Federal Census the named incorporated municipalities other than Orange have the following populations: Beaumont 119,175; Port Arthur 66,675; Port Neches 8,696; Groves 17,304; Nederland 12,036. Therefore the commercial zones of these cities which have not been specifically determined by the Commission would, in accordance with the findings of the Commission in Commercial Zones and Terminal Areas, Ex Parte Mc–37, 46 MCC 665, extend to the following limits; Beaumont —5 air miles; Port Arthur—4 air miles; Port Neches, Groves and Nederland—3 air miles. Each of these municipalities is situated on or near the northeastern boundary of Jefferson County and adjacent to the Orange County line.

It is plaintiffs' contention that by virtue of the Ex Parte MC–37 proceedings concerning terminal areas and commercial zones and the rules emanating therefrom they could lawfully serve the entire city of Orange, the incorporated municipalities of Pinehurst and West Orange and the unincorporated area lying within and wholly surrounded by the corporate limits of the city of Orange as extended, since a portion of the annexed strip of the city of Orange brought that city within 5 miles of Beaumont and contiguous to Port Arthur, Port Neches, Groves and Nederland. It was conceded by all parties before the Commission that plaintiffs may serve all points in their terminal areas relating to each of the above named authorized points.

The basic issue in this case is whether the agency action resulting from an adjudicatory proceeding constituted an amendment to a rule which had been formulated in a prior rule making proceeding. If this issue is decided in the affirmative the Commission has failed to follow the minimal procedural requirements for rule making in accordance with Section 4 of the Administrative Procedure Act thereby also violating the federal Constitution as regards the rights of plaintiffs to substantive and procedural due process of law. It is my opinion, however, that this issue must be answered in the negative, the action of the Commission in this case being an

interpretation of the statute rather than an amendment to a rule.

It is true that in this case the Commission in the exercise of its judicial function enunciated a statement of interpretation which will have general and particular application and future effect as in rule making. But it can be said generally that under the doctrine of stare decisis every legal rule developed by a judicial or quasi-judicial body in its law applying capacity has a like effect. The application of the law by a judicial tribunal may involve going behind the law, whether it be an administrative rule or congressional statute, and determining intent, purpose and policy in order to arrive at the underlying principle of the law. It is not a process of creating or changing policy, but rather a process of interpretation, explanation and elaboration.

Administrative agencies generally have the power of creating, changing or repealing subsidiary law or policy and also the duty of applying both primary and subsidiary law and policy. Neither power is purely legislative or judicial and there are instances, as in this case, when policy formulation and declaration may be permissible within the scope of adjudication.

Section 204(a) (6) of the ICA, 49 U.S.C. § 304(a) (6), makes it the duty of the ICC to "administer, execute, and enforce all provisions" of Part II of the Act and to "make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration."

Sections 202(c) and 203(b) (8) of the ICA, 49 U.S.C. §§ 302(c) and 303(b) (8), provide motor carriers a partial exemption from regulation. These two sections should be read together; their combined effect is partially to exempt from regulation under Part II all purely local motor transportation, in interstate or foreign commerce, within municipalities or within the commercial zones thereof, and partially to exempt from direct regulation under Part II similar local operations,

namely, transfer, collection and delivery performed within the "terminal areas" of line-haul carriers in connection with some intercity or intercommunity line-haul service. The act does not define or fix any rule for determining the territorial limits of either the "commercial zones" of municipalities or the "terminal areas" of carriers or the meaning of "municipality."

In Commercial Zones and Terminal Areas, 54 M.C.C. 21, 109, the Commission made the following determination:

> "The terminal area within the meaning of Section 202(c) of the Interstate Commerce Act of any motor carrier subject to part II * * * at any municipality authorized to be served by such motor carrier * * within which transportation by motor vehicles in the performance of transfer, collection or delivery services may be performed by, or for, such motor carrier * * * consists of and includes, all points or places, which are (a) within the commercial zone of such municipality as defined by the Commission * * *"

This was embodied in 49 C.F.R. 170.45 which there provides that the terminal area of a motor carrier authorized to serve a particular municipality shall be coextensive with the commercial zone of the municipality.

The question then arises as to what is embraced in the "commercial zone" of Beaumont and other disputed points, since these commercial zones are plaintiffs' terminal areas. In Ex parte No. M.C.–37, 46 M.C.C. 665, 698–699, the Commission held that the commercial zone of each municipality (except those individually determined) would henceforth be considered as extending out from the corporate limits of base municipalities either 2, 3, 4 or 5 miles, based on the population of the points involved, and providing that in addition to the basic mileage formula, the zone would embrace (1) contiguous municipalities, (2) all of any other municipality any part of which is within the specified mileage of the corporate limits of the base municipality

and (3) any municipality wholly surrounded by the base municipality, by a contiguous municipality, or by any municipality within the prescribed mileage limitation.

Since under this formula the commercial zones of Beaumont, Nederland, Port Neches, Port Arthur and Groves extend beyond a part of the strip annexed by Orange, the city of Orange would be a part of the commercial zones of plaintiffs if the annexed area is considered a municipality within the meaning of section 203(b) (8) of the ICA, 49 U.S.C. § 303(b) (8). I agree, however, with the Commission that the semi-circular strip of land annexed by the city of Orange is not such a municipality.

The pertinent portion of section 203(b) (8) is:

"Nothing in this part * * * shall be construed to include * * * (8) The transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point within such municipality, municipalities, or zone * * *."

The interpretation that the strip annexed by the city of Orange is not a municipality within the meaning of the Act is in accord with the intent of Congress, and fully within the authority delegated by Congress to the Commission to make such interpretation. In New York, N. Y., Commercial Zone, 2 M.C.C. 191 (1937), the Commission said in regard to the intent of Congress:

"Those who framed this language clearly had in mind this conception of urban transportation when they used the words 'wholly within a municipality.' They realized, however, there are many strictly urban communities which from a governmental standpoint, are made up of two or more municipalities, so they added 'or between contiguous municipalities.' On reflection it appeared that even these words might not be sufficiently comprehensive so, to cover all contingencies, they further added the words 'or within a zone adjacent to and commercially a part of any such municipality or municipalities.' Implicit in the additions, however, is the conception, with which the framers started, of a single and distinctively urban community, wholly within which motor carrier operations would be of the local cartage or street bus type."

That this was the intent is further evidenced by the statement of Senator Wheeler, Chairman of the Interstate Commerce Committee, on the floor of the Senate, that "Provision is also made that regulation shall not apply to what may be termed 'intra-municipal' or 'occasional' operations unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the policy of Congress enunciated in Section 202." 79 Cong.Rec. 5651.

In the case of Palmer Lines, Inc., v. United States, D.C., 179 F.Supp. 629, 633, in discussing the meaning of Section 203(b) (8), the Court said:

"* * * we do not find that the term 'municipality' is specifically defined in the Act. * * * 'Municipality' is a term which has been used to cover a multitude of governmental bodies, see 27 Words and Phrases, Municipality pp. 790–798 (1940) and Pocket Part. Its meaning contracts or expands depending on the context and purpose of the statute in which it is used. Since the words themselves in § 203(b) (8) give no indication of the meaning intended, we turn to the legislative history and the policy of the Act as aids in determining the intent of Congress. The only part of the legislative history that seems helpful is the ex-

planatory remarks by Senator Wheeler on the floor of the Senate. The examples of exempted transportation given are 'between New York City and New Jersey, and also, for instance, as between Washington and Alexandria, and other contiguous cities.' 79 Cong.Rec. 5650 (1935). We note that these examples are urban areas."

Clearly Congress intended the word "municipality" to designate compact, closely developed industrial, commercial and residential communities within which purely local motor carrier operations are conducted. Certainly it was not intended to designate such an area as annexed by the city of Orange as a municipality. The long semi-circular strip, in most places only 15 feet in width, consisting of one-half the width of various highways, roads and rivers and running 13 miles in one direction and 10 miles in another, has none of the attributes of an urban community. It is not a closely developed industrial, commercial and residential area, and is in fact incapable of supporting human habitation or business houses. Within the area no purely local motor carrier operations are conducted.

While it appears clear that the area annexed by Orange is not a municipality within the meaning of Section 203(b)(8), the plaintiffs contend that the Commission has no authority in the complaint proceeding to interpret the term "municipality," but must hold a rule making proceeding with the notice required in such rule making proceeding. The plaintiffs do not contend that the Commission lacks authority to make a specific exception to the general rule of Ex parte M.C. 37, but that the Commission could not amend the rule as to "municipality" in this complaint proceeding.

The contention, however, of plaintiffs that the rule was amended by the Commission is incorrect. In holding that the semi-circular area annexed to Orange is not a municipality, the Commission is interpreting the statute in order to carry out the purpose of the legislation which the rule seeks to effectuate. Interpretation of statutory terms does not require the type of notice and hearing that is required for the promulgation of regulations.

Professor Davis in his treatise, 1 Davis, Administrative Law (1958) page 292, states:

"Just as agencies, for developing law on a subject, often have a choice between proceeding by rule making or by adjudication, agencies also have a choice, for clarifying the meaning of rules, between amending the rules and interpreting them. The interpretation may be made in an adjudication or it may be a mere announcement."

In the case of Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court discussed the authority of the SEC to formulate new standards of conduct within the framework of the Holding Company Act. The Court clearly said:

"* * * [t]he function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise. * * * Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity."

In the case at bar, plaintiffs contend that the Commission was bound by its statement, in 49 C.F.R. 170.15, that a municipality is:

"* * * any city, town, village or borough which has been created by special legislative act or which has been, otherwise, individually incorporated or chartered pursuant to general State laws, or which is recognized as such, under the Constitution or by the laws of the State in which located, and which has a local government. It does not include a town of the township or New England type."

The record of the proceeding in which the above statement was enunciated reflects that the primary factor in the determination of a municipality was that it must be a city, town, village or borough. It was recognized that any urban community, whether incorporated or unincorporated, may be classified as a municipality within the meaning of Section 203(b) (8) of the ICA; but the Commission was likewise concerned with devising a workable reference point for application of the population mileage formula in ascertaining the commercial zone. This would explain the reference to "* * * incorporated * * * pursuant to general State laws, etc.," in the statement. This view is supported by the Commission's subsequent determination of a population mileage formula for ascertaining the commercial zone of unincorporated communities using the post office building of such communities as the point of reference for application of the formula, 46 MCC 665, 678–683, 54 MCC 21, 101.

The statement in 49 CFR 170.15 with reference to the term municipality should not be considered a final interpretation. In Ex parte No. Mc–37, 54 M.C.C. 21, 97, the proceeding establishing the scope of terminal areas, the Commission recognized the probable need for future special rules of construction, when it said:

"* * * whenever the limits of the commercial zone of a particular municipality are redefined and expanded, either by specific decision of this Commission or by application of the population-mileage formula to a changed set of facts [an upward revision of official population figures and by annexation of territory and expansion of its corporate limits], that authority previously granted to serve points in the commercial zone of that municipality should be construed as authority to serve all points included in such zone by any redefinition of its limits, except: * * * (2) where special or unusual circumstances, which cannot now be foreseen, warrant the promulgation by this Commission of some special rule of construction at the time of the redefinition." (emphasis supplied.)

Under the authority of Chenery, supra, it is not necessary for the Commission to hold a hearing with notice to determine the commercial zones of the cities involved. As stated in Chenery, 332 U.S. at 202, 67 S.Ct. at 1580:

"* * * the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. * * * In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."

Following the Chenery case the Fifth Circuit in the case of Optical Workers' Union v. NLRB, 227 F.2d 687, cert. den. 351 U.S. 963, 76 S.Ct. 1027, 100 L.Ed. 1484, held that the Board "* * * has authority to adopt and reverse policy, either in the form of an individual decision or as rule making for the future,

in any manner reasonably calculated to carry out its statutory duties, without regard to whether such action strictly conforms to the rules applicable to courts or legislative bodies."

The contention of plaintiffs, that in order to determine the commercial zone of the cities involved the population-mileage formula should be literally followed, would lead to an absurd result not intended by Congress. As stated in United States v. American Trucking Ass'n, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345:

> "[When the meaning of words] has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislature as a whole' [Ozawa v. United States, 260 U.S. 178, 43 S.Ct. 65, 67 L.Ed. 199] this Court has followed that purpose, rather than the literal words. * * The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function."

Even more important, if the Commission mechanically applied the population-mileage formula without regard to the meaning of "municipality" in the light of statutory purpose we would then be faced with the problem of a rule being formulated and applied in a manner outside the scope of the agency's statutory authority. An administrative agency does not have power to legislate nor may it attempt to do so under the guise of its rule making power. It only has power to carry out the will of the legislature. The agency cannot issue rules inconsistent or out of harmony with the statute, nor can the statute be altered, added to, extended or enlarged by administrative rules. Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268; Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129; F. C. C. v. American Broadcasting Co., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699; Bingham's Trust v. Commissioner, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670; Helvering v. Sabine Transp. Co., 318 U.S. 306, 63 S.Ct. 569, 87 L.Ed. 773; Miller v. United States, 294 U.S. 435, 55 S.Ct. 440, 79 L.Ed. 977.

I fail to find any manner in which plaintiffs' rights have been violated. The agency's interposition of a hitherto presumed but unstated standard in this case is proper and may be applied with retroactive effect so long as this new decision does not create hardships so great as to constitute arbitrary and capricious action under the APA. Chenery, supra, Optical Workers' Union, supra; NLRB v. Guy F. Atkinson Co. (C.A. 9, 1952) 195 F.2d 141; NLRB v. Mall Tool Co. (CCA 7, 1941) 119 F.2d 700. As stated in Optical Workers' Union at 691 of 227 F.2d: " * * * we can discern no valid distinction between a decision made under these criteria and one made under the former unannounced policy."

While there may be some merit in a general hearing with notice the benefit must be balanced with the mischief of producing a result contrary to legislative intention or to equitable principles. Chenery, supra. In the case brought here for review the evidence is so clear that it is difficult to believe there would be a different result upon another hearing. To require such a hearing would mean a delay of years to reach the same result. Meantime plaintiffs would have the benefit of servicing Orange and Intervenors would have competition in the service to Orange not intended under the respective certificates of the carriers.

It is my opinion that the application for injunction should be denied and cause dismissed.

## Appendix