Beatrice MACIOCI, et al, Plaintiffs
vs.
COMMISSIONER OF REVENUE,
et al, Defendants

No. 47464

Superior Court
Commonwealth of Massachusetts

November 6, 1981

FITCHBURG GAS & ELECTRIC
LIGHT CO.—81-19364
David C. DONAHUE—81-19424
James RIVER—MASSACHUSETTS
INC.—81-19425
GENERAL ELECTRIC
COMPANY—81-19426
James PAVLIN, TRUSTEE OF
CYN-COR REALTY TRUST—81-19427
Bernard M. FREEMAN and
Gerard F. BERUBE—81-19428
LITTON BUSINESS SYSTEMS,
INC.—81-19429
Wallace MURRAY CORPORATION
Simonds Cutting Tools Division
81-19430
James RIVER—FITCHBURG, INC.
81-19431
ROGERS of FITCHBURG, INC.
81-19432

Plaintiffs
vs.
CITY OF FITCHBURG, Defendant

**Laurence S. Fordham, Philip Burling, Peter A. Fine, David R. Pierson,** counsel for plaintiff
**Francis X. Bellotti, Atty. Gen., James A. Aloisi, Jr. A.A.G., Cuddy & Lynch, John M. Lynch,** counsel for defendant

## MEMORANDUM OR DECISION

These cases together constitute the second test of taxation of property by a city pursuant to the "Classification Amendment" to the Constitution of the Commonwealth, part II, c.1, §1, art.4 of the Massachusetts Constitution, as amended by art. 112 of the Articles of Amendment, approved November 7, 1978. As the sequelae to the original controversy which, after a full opinion in the Superior Court, ultimately failed on appeal without reaching the merits directly due to a want of subject matter jurisdiction, **Litton Business Systems, Inc. v. Commissioner of Revenue,** Superior Court No. 44824, remanded for further hearing and thereupon dismissed, **Litton Business Systems, Inc. v. Commissioner of Revenue,** Mass. Adv. Sh. (1981) 1207, 1209, it is necessary to sketch the prior proceedings in some detail in order to understand the present posture of the cases.

## 1. Prior Proceedings

The original Litton action was commenced in the Superior Court on October 21, 1980 alleging that the Commissioner of Revenue and the mayor, assessors, and city councillors of Fitchburg failed to act in a timely matter with respect to certain determinations required of them under the state tax laws, failed to use available free cash to reduce the Fitchburg tax levy for fiscal year 1981, and, individually or in concert, failed to properly assess real property within the city of Fitchburg at 100% of full and fair cash value so that the resulting classification of property, made pursuant to art. 112 of the amendments to the Massachusetts constitution (the "Classification Amendment") and its enabling legislation, St. 1979, c. 797, was both statutorily invalid and unconstitutional.

The case came before the Court upon a statement of agreed facts which amounted to a case stated, **Frati v. Janninni**, 226 Mass. 430, 431 (1917).

> (A)t oral argument in the Superior Court the defendant Commissioner sought to file a supplementary affidavit by the chief of the responsible bureau. Upon objection by the plaintiffs the Commissioner asked to be relieved of her assent to the statement of agreed facts as an improvident stipulation and requested an evidentiary hearing. The judge instead treated the affidavit as a judicial admission binding on the Commissioner but not on the plaintiffs.

**Litton Business Systems, Inc. v. Commissioner of Revenue**, Mass. Adv. Sh. (1981) at 1211-1212. In its written decision, the Superior Court held that, upon the agreed statement of facts, the Commissioner had acted arbitrarily in failing to follow her own guidelines and declared the tax classification of Fitchburg for fiscal year 1981 invalid.

The Court further declared that "the remaining tax bills for real and personal property taxes due during fiscal year 1981 must be reduced to pass on to the taxpayers obligated to pay such bills the benefits of available free cash". Superior Court Memorandum and Order, January 21, 1981. The Superior Court judge reported the propriety of his actions to the Appeals Court pursuant to Mass. R. Civ. P. 64.

Having essentially lost in the Superior Court, the Commissioner and the city defendants repudiated the stipulation made in the statement of agreed facts and moved "to dismiss the action for lack of subject matter jurisdiction, filing supporting affidavits and certificates tending to show that the plaintiffs (contrary to what had earlier been admitted by the defendants) did not include ten 'taxable inhabitants' of the city, as required by G.L. c. 40, §53." **Litton, supra**, at 1208-1209. Upon analysis, the Supreme Judicial Court, which had transferred the case to itself and ordered and expedited hearing, agreed and remanded the matter to the Superior Court for a hearing on whether certain of the plaintiffs were taxable inhabitants of the city. Further, the full Court, in effect, vacated the statement of agreed facts with the statement, "If we had not ordered the action dismissed, we would have relieved the commissioner of her assent to the statement of agreed facts and remanded the case for and evidentiary hearing." **Litton, supra**, at 1212. Finally, despite the lack of subject matter jurisdiction, the Supreme Judicial Court declared that the Superior Court judge had correctly decided that "under St. 1979, c.151, §12A, free cash available on July 1, 1980, was to be used to reduce the tax levy for fiscal year 1981." **Ibid.**

While the skirmishing over subject matter jurisdiction was taking place in the Supreme Judicial Court, the plaintiffs in the Litton litigation and certain other individuals and corporations, all of them owners of commercial or industrial real property in the city of Fitchburg, commenced ten separate actions in the Worcester Superior Court pursuant to G.L.c. 60, §98, to recover the taxes they

had paid pursuant to the classification system implemented by Fitchburg for fiscal year 1981. Then, four days after the remand of the original **Litton** action to the Superior Court, the **Macioci** plaintiffs commenced what is now Suffolk Superior Court No. 47464 in the Supreme Judicial Court for the County of Suffolk. The **Macioci** complaint raised the same substantive issues as the original **Litton** action and proffered as plaintiffs an host of taxable inhabitants of Fitchburg to satisfy any jurisdictional requirements. Equitable relief was sought from the single justice of the Supreme Judicial Court to stay the issuance of the tax bills for the second half of fiscal year 1981 but, after transfer of the **Macioci** action to the full bench of the Supreme Judicial Court, it too was remanded to the Superior Court.

The net effect of all this litigation appears to be the vacating of the original Superior Court decision for want of subject jurisdiction, the vacating of the statement of agreed facts in **Litton** as improvidently made, and an expression of agreement (its precise standing unclear) with the Superior Court's reasoning as to "free cash" in the opinion which had been vacated.

Finding themselves back in the Superior Court, the parties agreed to consolidate the Suffolk and Worcester actions and, pursuant to Standing Order No. 14-80, the Chief Justice assigned the consolidated actions to a single justice for further proceedings.

Since trial of the action concluded only days before the October tax bills for fiscal year 1982 were due to be sent out, the Court entered a prompt order for partial judgment, see Mass R. Civ. P. 54(b), on the "free cash" issue and disposed of the pending motions for equitable relief. This procedure tracks that followed in **Litton** itself at 1209.

Having entered this order and partial judgment, it is clear that the Court must write an opinion setting forth its reasoning. Mass. R. Civ. P. 52(a). What is less clear--and remains a matter of dispute between the parties--is whether the Court ought assay a declaration of the respective rights of the parties. This Court is well aware that "under G.L.c. 231A, §3, as amended by St. 1974, c. 630, §2, it is a sufficient reason for denying declaratory relief that the declaration 'if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceedings.' " **Mass. Bay Transp. Auth. Advisory Bd. v. Mass. Bay Transp. Auth.,** Mass. Adv. Sh. (1981) 403, 408 (Braucher, J.). Indeed, even in tax cases declaratory relief is inappropriate if the resolution of the dispute "has no present bearing on the assessment and collection of...taxes." **Selectmen of Hull v. County Commissioners of the County of Plymouth,** Mass. App. Ct. Adv. Sh. (1981) 1275, 1276. However, this Court may exercise its discretion to grant declaratory relief in certain exceptional "tax controversies where to do so would constitute 'a convenient means of promoting justice and will not unduly interfere with the collection of taxes.' **Meenes v. Goldberg,** 331 Mass. 688, 691. **Madden v. State Tax Commn.,** 333 Mass. 734, 735-37. **Stow v. Commissioners of Corps. & Taxn.,** 336 Mass. 337, 339-340. **Bettigole v. Assessors of Springfield,** 343 Mass. 223, 235-236 (1961)." **Second Church in Dorchester v. Boston,** 343 Mass. 477, 479 (1962) (Spalding, J.).

"Favorable to maintenance of a declaratory action...is the circumstance that the issue is important or novel or recurrent; that the decision will have public significance affecting the interests of many besides the immediate litigants; or that the case reduces to an issue of law without dispute as to the facts." **S.J. Groves & Sons Co v. State Tax Commn.,** 372 Mass. 140, 142 (1977) (Braucher J.), quoting from **Sydney v. Commn. of Corps. & Taxn.,** 371 Mass. 289, 293-295 (1976). In the present instance, the process of tax classification followed by the Commissioner and the assessors of the Commonwealth's cities and towns is still novel, is certainly recurrent, and it is very important. Moreover, a declaration of

rights will have public significance affecting the interests of many through the Commonwealth. Unfortunately, the present dispute does not, despite the best efforts of the parties, reduce to an issue of law without dispute as to the facts. Consistent with its obligation under Mass. R. Civ. P. 52(a), this opinion resolves those factual disputes and, in exercise of its discretion, declares the rights of the parties.

## 2. Real Property Assessment in Fitchburg

Tax classification of real property may not be implemented in any city or town until the Commissoner of Revenue (Commissioner) has certified in writing to the assessors of such city or town that the assessments on the real property that they propose to make are at full and fair cash valuation. G.L.c. 59, §2A(c). See G.L.c. 59, §§38, 42. Full and fair cash valuation is thus a "prerequisite" to tax classification within the Commonwealth of Massachusetts. **Associated Industries of Massachusetts, Inc. v. Commissioner of Revenue,** Mass. Adv. Sh. (1979) 2027, 2034.         Full and fair cash value

> means fair market value, which is the price an owner willing but not under compulsion to sell ought to receive from one willing but not under compultion to buy. It means the highest price that a normal purchaser not under peculiar compulsion will pay at the time and cannot exceed the sum which the owner after reasonable effort could obtain for his property.

**Bennett v. Board of Assessors of Whitman,** 354 Mass. 239, 240 (1968) (Wilkins, C.J.), quoting from **Boston Gas Co. v. Assessors of Boston,** 334 Mass. 549, 566 (1956).

"Actual sales are, of course, very strong evidence of fair market value, for they represent what a buyer has been willing to pay to a seller for a particular property." **First National Stores Inc. v. Board of Assessors of Somerville,** 358 Mass. 554, 560 (1971). It is for this reason that the Commissioner requires every

sale in a particular city to be reported to her Bureau of Local Assessment (Bureau) on a particular form known as a 3S form. Of course, the evidence of actual sales is not conclusive of city-wide assessments since all the parcels of land in a city are not sold during each assessment period. Indeed, since the most desirable properties are the ones most frequently sold, calculations of city-wide land values based only on actual sales over a preceding year would tend to be somewhat too high. Accordingly, city-wide assessment necessarily involves elements of expertise and judgment. It is generally agreed that the most effective method of general land assessment is a parcel-by-parcel evaluation made by experienced local assessors with access to the most advanced computerized, statistical techniques. The trouble with such an assessment is that it takes so long to conduct the parcel-by-parcel valuation that the results are frequently rendered obsolete by inflation or other market forces even before the revaluation is complete. Therefore, conceding the desirability of a parcel-by-parcel valuation, statistical assessment techniques are vitally necessary in order to keep city-wide assessments current.

Assessment in Fitchburg presents particular problems. The 'city itself is physically complex. Growing up on a bend of the North Nashua River, Fitchburg's topography is a mixture of steeply rolling hills, a narrow river valley, and rural orchard and farm lands. The structures in the city are also highly variegated, ranging from antiquated brick mill buildings, through a partially rehabilitated commercial district with numerous multi-storied wooden tenements having a low current market value, to post-war developments homogeneous in nature, and a smattering of moderately expensive new houses. By number, approximately fifty percent of the parcels of land within the city are devoted to single family residence housing, a type of property classified for assessment purposes as "R 1".

Fitchburg's last completed city-wide

parcel by parcel revaluation took place in 1970. Valuations derived from the 1970 appraisal were implemented during fiscal year 1972. In 1975, the city began an update of property valuation, carried out internally by the Board of Assessors (Assessors). Based on its study of sales during the years 1975, 1976, and 1977, the Assessors derived factors to be applied to the old valuations. These factors--actually a multiplier thought by the Assessors to take account of inflation and other market forces--were applied to the 1975, 1976, and 1977 sales data to determine the assessed valuations for fiscal year 1979. In some instances, the factor or multiplier was applied throughout and entire class of property and in others, e.g., residential property, different factors were applied to different sub-classes, e.g., R 1--single residence housing--within the general class.

### 3. Tax Classification

The Massachusetts constitution has long required that property be assessed for taxation proportionately and reasonably uniformly at full and fair cash value. Massachusetts Constitution, part II, c.1, §1, art. 4. **Board of Assessors of Lynn v. Shop-Lease Co., Inc.,** 364 Mass. 569, 572 (1974). **Sudbury v. Commisioner of Corps. & Taxn.,** 366 Mass. 558, 563 (1974). **Commonwealth v. Town of Andover,** Mass. Adv. Sh. (1979) 1619, 1620. **Opinion of the Justices,** Mass. Adv. Sh. (1979) 1756, 1761. Prior to the 1978 amendment of Article 4, the Classification Amendment, the Constitution of the Commonwealth had been interpreted to require interclass equality. **Bettigole v. Assessors of Springfield,** 343 Mass. 223, 230 (1961) (Cutter, J.). The classification Amendment made lawful differential taxation of property on the basis of classification by use. The Classification Amendment accomplishes this result by amending part II, c.1, §1, art. 4 of the Constitution by inserting, after the clause authorizing the General Court "to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of, and persons resident, and

estates lying, within said Commonwealth" the words "except that...the General Court may classify real property according to its use in no more than four classes and...assess, rate and tax such property differently in the classes so established, but proportionately in the same class."[1] The Constitution thus now requires nothing more than "proportionality per class per municipality." **Associated Industries of Massachusetts v. Commissioner of Revenue,** Mass, Adv. Sh. (1979) 2027, 2036.

After the votes had ratified the Classification Amendment, the General Court enacted implementing legislation in late November 1979. St. 1979, c.797 (the Enabling Act).

The process established by the Enabling Act which leads to the levying of local property taxes under a system of use classification begins with the Commissioner. As an essential first step, the Commissioner is required to determine "whether or not the locally assessed values represent the full and fair cash valuation for each class of real property." G.L.c. 58, §1A.[2]

If the Commissioner determines that the community is assessing at full and fair cash valuation, she is required to determine a "minimum residential factor" for the community and then to transmit determinations of the taxable values in each use class and the minumum residential factor to the community. G.L.c. 58, §1A. A community may not implement classification until the Commissioner has

---

[1] The proportionality requirement continues to be interpreted, as has long been the case, to mean proportionality within a class in a taxing community, not proportionality on a statewide basis. Compare **Associated Industries of Massachusetts v. Commissioner of Revenue,** Mass.Adv.Sh. (1979) 2027, 2036; **Opinion of the Justices,** Mass.Adv.Sh. (1979) 1756, 1769, with **County Commrs. of Hampshire, Petitioners,** 143 Mass. 424, 433 (1887); **Assessors of Quincy v. Cunningham Foundation,** 305 Mass. 411, 416 (1940).

[2] The property classes defined in G.L.c. 59, sec. 2A are "residential," "open space," "commercial," and "industrial."

certified in writing that it is assessing property at full and fair cash value and that a majority of its assessors are qualified to classify property. G.L.c. 59, §2A(c). If such certification has been made, the assessors must classify all real property as residential (Class 1), open-space (Class 2), commercial (Class 3), or industrial (Class 4). G.L.c. 59, §2A(b).

Once the Commissioner has certified that a city is assessing property at full and fair cash value, board of assessors, with the approval of the selectmen in each Town, and the mayor, with the approval of the city council, must determine the percentages of the local tax levy to be borne by each class of real property and by taxable personal property "for the next two fiscal years." G.L.c. 40, §56. After the percentages have been determined and certified by the Commissioner, they are transmitted to the board of assessors to be used in setting tax rates. **Ibid.**

Under the statutory scheme just described, the Commissioner has substantial authority and responsibilities and the assessors must follow her lawful commands. See, **Sudbury v. Commissioner of Corps. & Taxn.**, 336 Mass. 558, 563-64 (1974); **Commonwealth v. Town of Andover**, Mass. Adv. Sh. (1979) 1619, 1627-1628. The Commissioner has long been "responsible for administering and enforcing all laws which the department (of Revenue) is or shall be required to administer or enforce." G.L.c. 14, §3. The Commissioner may "direct" or "require" (of assessors) such action as will tend to produce uniformity throughout the Commonwealth in the valuation, classification and assessments." G.L.c. 58, §§1A, 4.[3] As an explicit part of her statutory authority, the Commissioner is empowered to issue guidelines to direct local assessors in the performance of their duties. Pursuant to G.L.c. 58, §1, the Commissioner may establish "such reasonable rules, regulations and guidelines as may be necessary to establish minimum standards of assessment performance." Moreover, G.L.c.

58, §3, provides in relevant part:

In order to assist the assessors in performance of their duties, the Commissioner shall prepare, issue and periodically revise guides for local assessors. Such guides shall include the rules, regulations, and guidelines of the Commissioner relative to the assessment, classification and administration of local taxes.

In short, the Commissioner has the authority to enforce "all laws relating to the valuation, classification and assessment of property" and to "supervise the administration of such laws by local assessors in accordance with the rules, regulations and guidelines established under the provisions of (G.L.c. 58, §1)." G.L.c. 58, §1A. Thus, both the case law and the relevant statutory scheme indicate that the Commissioner has far-ranging powers over the assessment of local property taxes, even though responsibility for the valuation of the property in the 351 cities and towns of the Commonwealth is ordinarily committed to local assessors.

With the statutory scheme in mind, this court can take judicial notice that, during the four years immediately prior to the acts here questioned, the Massachusetts property tax system was subjected to several significant alterations, including a substantial constitutional change and two separate and distinct property classification schemes—the first, St. 1978, c. 580, enacted in anticipation of adoption of Classification Amendment (the shelf legislation) and St. 1979, c. 797, the

---

[3] Additionally, the Commissioner may require assessors to file information or reports and may direct local officials to furnish information she "deems necessary" to determine and establish for each city and town an equalized valuation. G.L.c.58, secs. 1A, 6, 10. She may also remove assessors from office, appoint additional assessors, G.L.c.41, sec. 27, and may cause them to be prosecuted for breach of duty. G.L.c.58, sec. 1A.

Enabling Act.[4] Each one of these myriad changes has imposed additional responsibilities on the Commissioner and presents "problems of great practical complexity." See, **Carr v. Assessors of Springfield**, 339 Mass. 89, 93, n.2 (1959).

To discharge her many responsibilities in this area, the Commissioner has the Bureau of Local Assessment (Bureau) in which the Commonwealth employs 15 professionals and 5 secretary-clerks. The Bureau has no computer but shares computer time with the Divisions of the Department of Revenue charged with income and sales tax collection and regulation throughout the Commonwealth. It is beyond dispute that the Bureau is inadequately staffed and without the resources to accomplish its many functions in the manner and to the degree of accuracy which its professional employees think desirable. This is not to say that it cannot discharge its minimal constitutional and statutory functions--a point which requires further analysis; rather, the point is simply that everyone agrees that, with more funding, the job could be done significantly better, and the lack of resources is a fact to be considered in judging the Commissioner's and the Bureau's conduct.

In considering what was, in fact, done by the Commissioner, the chronology of material events begins even before the enactment of the Classification Amendment. Upon the passage of the shelf legislation, the Commissioner promptly promulgated guidelines to local assessors, describing to them the process by which their community would become certified to implement tax classification. In relevant part, these guidelines provided for a statistical analysis of the arm's-length residential and land sales in eligible municipalities to ascertain the median ratio between assessed and market value[5] and variation from the median ratios in these classes. The Commissioner required that, for certification purposes, the median ratio for residential properties must be within 10% of full value or 100%, the average variation

from such ratio[6] must be no more than 10%, and the variation between residential and land ratios must be less than 20%. The initial guidelines go on to ex-

---

[4] A brief chronology is appropriate: In 1975, the legislature in joint session approved a Classification Amendment to the state Constitution. In 1977, a second joint session approved the same amendment. In July 1978, the legislature enacted St.1978, c.580, sec. 38, which, in anticipation of ratification of the Classification Amendment, completely transformed traditional modes of property valuation and taxation. On November 8, 1978, the voters adopted the Classification Amendment. In 1979, the legislature enacted St.1979, c.797, the Enabling Act, which implements the Classification Amendment in a completely different manner than the shelf legislation sought to do. That same year, the legislature enacted the two-year "tax cap" law, St.1979, c.151, which, **inter alia,** limited the amount of money a community could spend to a sum not greater than 104% of the prior year's levy. The enactment of St.1980, c.580 (Proposition 2½) by the people is the most recent alteration of the Commonwealth's property tax structure.

[5] The ratios to which the guidelines referred are derived from an analysis of the 3S forms submitted by the community. The ratio is nothing more than a comparison of the assessed valuation of a particular parcel to its actual sales price. Such ratios also may be expressed as a fraction, with assessed valuation as the numerator and the actual sale price as a denominator. In assessment parlance, these ratios are known as assessment-to-sale ratios or ASR. The "median" is a measure of central tendency, being the middle or central number in a group of numbers arranged in numerical order. Thus the median ratio is the middle ratio of a group of ratios when the group is arranged in order of magnitude. International Association of Assessing Officers, **Improving Real Property Assessment,** (1978) 3. For example, in the group 10%, 20%, 80%, 90%, 100%, the median is 80%. Another common measure of central tendency is the "mean," defined here since the necessity of comparing the median to the mean is an aspect of the analysis herein. The mean is nothing more than the arithmatic average of the numbers in a set or, in the present instance, the arithmatic average of the ratios; that is, the sum of all the ratios divided by the number of ratios. **Ibid.** In the previous example, therefore, the mean is 300% divided by 5, or 60%.

[6] The phrase "average variation from such (median) ratio" is known more commonly in assessing parlance as the coefficient of dispersion or COD. The COD is an accepted measure of assessing uniformity or proportionality throughout a class. For example, while it may

plain that the Bureau will conduct appraisals of representative commercial and industrial properties for comparison with their assessed values to ascertain the accuracy and uniformity of valuations in these classes. Finally, the Commissioner explained that her Bureau would review the revaluation program in the municipality and its general assessment practices to determine the reliability of the valuation base and the ability of the assessors to maintain full and uniform assessment in future years.

Some time during the first six months of 1979, the Commissioner undertook a study of assessment performance in Fitchburg to determine whether it was assessing property as of January 1, 1979 at full and fair cash value and thus would be eligible to implement classification under the shelf legislation for fiscal 1980. Fitchburg received this treatment because it was one of a group of cities and towns which had completed revaluations, see p. 9, **supra,** which were to go into effect as of January 1, 1979. The Commissioner's study was based on a review of Fitchburg's assessment performance during 1978 as reflected by arm's length sales of real property reported on the 3S forms for the calendar year 1978. Medians and CODs were calculated for all property classes as to which 3S forms for 1978 had been submitted.[7] Appraisals were also done for selected properties in the R 4, commercial and industrial classes.

On the basis of the shelf legislation study, the Commissioner determined that Fitchburg was not assessing property at full and fair cash value and thus was not eligible to implement classification in fiscal year 1980. The Commissioner so informed the city by letter to the Assessors dated August 6, 1979 and by a letter to the mayor dated August 7, 1979.

Upon enactment of the Classification Amendment, the legislature again addressed the issue of the manner in which tax classification--now a reality--ought to be implemented. The result was the Enabling Act, St. 1979, c. 797, passed in

well be the case that in some communities owners of residential land are assessed at considerably less than full and fair cash value, a low COD--15% or less--indicates that as among each other, the residential homeowners are being assessed fairly with respect to others in their class. The word "fairly" here expresses the concept of equality or proportionality, not legality, since intentional under-valuation of a discrete class has long been illegal. **Bettigole v. Assessors of Springfield,** 343 Mass. 223 (1961) Cutter, J.).

As calculated by the Commissioner, the coefficient of dispersion is computed by dividing the average deviation from the median by the median. In algebraic notation, the coefficient of dispersion may be expressed as follows:

$$CD = \frac{\sum_{i=1}^{N} |M - R_i|}{N}$$

where CD = coefficient of dispersion
  N = number or ratios in group
  M = median ratio
  Ri = ithe ratio (e.g., R2, second ratio in group)

In other words:

$$CD = \frac{\text{sum of absolute values of differences between each ratio and median}}{\frac{\text{number of ratios in group}}{\text{median}}}$$

This yields a number expressed in decimal notation, e.g., .156, which, by moving the decimal point two places to the right, can be expressed as a percentage, e.g., 15.6%.

By way of example, consider the following series of nine assessment/sales ratios: 70%, 70%, 100%, 100%, 100%, 105%, 130%, 130%. The coefficient of dispersion of the group, as defined by the Commissioner, is 15%, computed as follows: (1) The median ratio is 100%. (2) The sum of the absolute values of the differences of the individual ratios from the median is 135. (3) There are nine ratios in the group. (4) Thus, the coefficient of dispersion is (135/9)/100, which equals .15 or 15%.

[7] At the time of the shelf legislation study, these classes were R 1 (residential, single-dwelling unit), R 2 (residential, double-dwelling unit), R 3 (residential, triple-dwelling unit), R 4 (residential, four or more dwelling units), RC (residential/commercial, C (commercial), I (industrial), A/H (agricultural - horticultural land), and L (land, vacant without improvements). No arm's length A/H sales were reported during 1978.

late November 1979.

To comply with the new statute, the Commissioner issued a new set of guidelines on February 11, 1980. These guidelines, which purport to describe the manner in which "the Commissioner will decide which cities and towns are eligible for certification (i.e., permission to implement tax classification)." provide that those cities and towns "which have complied with the revaluation requirements of the court and the Commissioner, and which are likely to be at fair cash valuation as of January 1, 1980 will automatically be eligible for review by the Bureau of Local Assessments." According to the guidelines,

> The certification review will consist of a statistical analysis of arm's-length residential and land sales to determine the median ratio between assessed and market value and the variation from the median ratio in these classes.
>
> A median ratio within 10% of full value and an average variation from such ratio of no more than 15% is acceptable for residential property. The variation between residential and land ratios must be less than 20%. Additionally, the bureau will conduct appraisals of representative commercial and industrial properties for comparison with their assessed values to verify the accuracy and uniformity in these classes. Finally, the bureau will review the revaluation program and general assessment practices to determine the reliability of the valuation base.

a. The Validity of the Tax Classification Guidelines on Their Face

The parties agree that both the Classification Amendment to the Massachusetts Constitution and the statutory Enabling Act thereunder require full and fair valuation within a community as an essential precondition to tax classification. The differences arise when the agreed-upon standard comes to be translated into the actuality of assessment within a particular community. The plaintiffs argue that the guidelines fail on their face to test adequately whether a community is assessing property at full and fair cash value. As an initial matter, it may be noted that the shelf legislation guidelines required a COD for residential land of not more that 10% whereas the Enabling Act guidelines permitted a COD for residential property of not more than 15%, a change which permits certification for tax classifications notwithstanding a significant decrease in proportionality within the residential land class. The matter is of no moment, however, since the plaintiffs' own expert testified that a COD of not more than 15% for residential land was an acceptable assessing standard.

More important, say the plaintiffs, is the fact that the guidelines establish specific limits on assessment performance for residential property only, i.e., requiring that the residential median ratio must be within the range 90% to 100%, and the coefficient of dispersion about the residential median must be no greater than 15%. Moreover, no limit on the coefficient of dispersion is established for land and the limit on assessment level for land is relative only, pegging the land median to the residential median. Finally, the plaintiffs point out that the guidelines establish no limits for testing the prevailing level of assessment and the uniformity of assessment for commercial and industrial property, nor for property as a whole.[a]

Despite the poor quality of the draft-

---

[a] Indeed, the complaints listed in the body of the opinion are limited to those remaining after the Commissioner's agents have explained in detail the meaning of the guidelines. Absent the benefit of full hearing on the issue, the guidelines as written are yet more opaque, even to a skilled assessor. The sentence which indicates that "the variation between residential and land ratios must be less than 20%" may be interpreted in a variety of ways. It may indicate that the COD for land shall not be greater than 20% more than the COD for residential. This in-

smanship, however, the flaws perceived by the plaintiffs are far more hypothetical than real. They assign no weight whatsoever to the requirement that "the Bureau...conduct appraisals of representative commercial and industrial properties for comparison with their assessed values to verify the accuracy and uniformity in these classes...(and that) the Bureau review the revaluation program and general assessment practices to determine the reliability of the valuation base." These later requirements of the guidelines as written are sufficient to answer the plaintiffs' initial objections. The absence of specifically prescribed median ratios and CODs for commercial and industrial property, and the absence of a prescribed COD for land, is hardly fatal in light of the general requirement imposed on the Bureau to review general assessment practices. Since the Commissioner is not required to promulgate guidelines at all, she can hardly be faulted (though she may get poor marks for draftsmanship) for promulgating guidelines which do not specifically pin down every possible criteria of assessment validity. See, Shapiro, The Choice of Rulemaking of Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. 921, 923-924 (1965).

Of more merit is the plaintiff's argument that the guidelines, on their face, permit an unconstitutional degree of undervaluation of specific classes of property. Even under the Commissioner's interpretation of her own guidelines, the language appears to permit the median ratio for land to be at 72% of full and fair cash value.[9] Standing alone, then, the guidelines appear to endorse a deliberate policy of assessing residential land at 90% of full and fair cash value and undeveloped land at 72% of full and fair cash value. Were this to be the actual effect of the guidelines in practice, they would be unconstitutional. **Leto v. Board of Assessors of Wilmington,** 348 Mass. 144, 150 (1963) (Cutter, J.) ("Obviously no deliberate policy of assessing residential land and structures at 80% of fair

cash value and commercial and industrial land and structures at 100% (or more) of fair cash value will comply with constitutional and statutory requirements"). **Beardsley v. Board of Assessors of Foxboro,** 369 Mass. 855, 857-959 (1976) (median ratio differences of 3.8%, 7.8%, 9.9% and 8.1% between subclasses of residential land over four successive years held impermissible). **Martin v. Keating** (Superior Court, Middlesex County, Eq. 35141 (1973) ) (Adams, J.) (deliberate policy of assessing different classes of property at between 15 and 17 percentage point differences held impermissible).[10]

Against this challenge to the guidelines on their face, the Commissioner erects two defenses. Neither is persuasive, at least along the lines outlined by the Commissioner.

First, the Commissioner argues that the

---

terpretation is supported by the facts that the term "variation" is a word of art relating to measures of uniformity, such as the COD, and that assessed sales ratios for land tend to vary more widely than those for residential properties, even where outstanding assessment practices are followed, and thus have greater CODs. On the other hand, the sentence may indicate that the difference between residential and land median ratios must be less than 20% of the residential median, or perhaps, less than 20% of the land median, or perhaps, less than 20 percentage points. Under one interpretation, the guidelines provide no limit for the median ratio for land, while under the second there is no limit on the COD for land. The explanation of the Commissioner's agents, however, makes clear that the relationship required in the guidelines is a relationship between residential and land median ratios (and not CODs) and that the difference between the residential and land median ratios must be less than 20% of the residential median.

[9] If the residential median ratio were at 90% (the permissible 10% less than 100%), land median ratio could be as much as 20% of the residential median ratio away from the residential median, i.e., 18 percentage points below the residential median, or 72%.

[10] In the absence of controlling appellate precedent, a Superior Court decision on a particular point states the law of the Commonwealth on that point. **Local Division 589, Amalgamated Transit Union, AFL-CIO v. Commonwealth,** F.2d (1st Cir. 1981) (Slip Opinion, September 30, 1981, at 40-42).

question whether the terms of the guidelines comport with the terms of the Enabling Act is not open for review by this Court. She claims it is irrelevant to a decision of this case to consider the process she used to determine that Fitchburg was an appropriate community to certify for tax classification. She argues that the question of whether, through her guidelines, the Bureau employed an appropriate or supportable process to determine whether Fitchburg was assessing property at full and fair cash value is none of this Court's business. She reaches these conclusions by reading G.L.c. 58, §1A, P.2 to delegate to her substantive or legislative authority to make determinations, on a case by case basis, as to whether individual communities are assessing property at or near full value and are, therefore, eligible for certification for tax classification. Indeed, as her counsel aptly argues the point, "If we had taken darts and thrown them at a board, this Court would have no choice but to uphold tax classification in Fitchburg so long as the numbers (i.e., the actual assessment level) justified it."

This Court disagrees. If, as this Court has ruled above, it is proper to declare the rights of the parties, it is assuredly proper to examine the process by which the Commissioner determined that Fitchburg was eligible for tax classification. To fail to do so would be to "abdicate (judicial) review" entirely. See, **Schweiker v. Gray Panthers**, U.S., 69 L. Ed. 2d 460, 470 (1981). The people of the Commonwealth are entitled to something more of their governmental process than merely fortuitous results. "Even in a field in which the agency is acknowledged to have latitudinous discretion, a court would not be excluded if the agency appeared to have been actuated by inapposite or unreasonable considerations." **West Broadway Task Force, Inc. v. Commissioner of the Dept. of Comm. Affairs**, 363 Mass. 745, 751 (1973) (Kaplan, J.). As framed by the pleadings in this case, if this Court were to find that the Commissioner's conduct was clearly arbitrary or

capricious, it could so declare even though, in the case of Fitchburg, the result might be in conformity to constitutional norms.[11]

Failing in her first argument, the Commissioner retreats to her second line of defense. If there is to be judicial review, she argues, the scope of such review ought be extremely narrow with the Court requiring the plaintiffs to shoulder the "burden of proving on the record 'the absence of any conceivable ground upon which (the rule) may be upheld.' " **Purity Supreme, Inc. v. Attorney General**, Mass. Adv. Sh. (1980) 1349, 1363 (Quirico, J.), quoting from **Colella v. State Racing Comm'n.**, 360 Mass. 152, 156 (1971). Accord, **Consolidated Cigar Corp. v. Department of Public Health**, 372 Mass. 844, 855 (1977); **Grocery Mfrs. of America, Inc. v. Department of Pub. Health**, Mass. Adv. Sh. (1979) 2291, 2303; **White Dove, Inc. v. Director of the Division of Marine Fisheries**, Mass. Adv. Sh. (1980) 1043, 1049.

The difficulty with this argument is that the guidelines were not promulgated pursuant to G.L.c. 30A and are therefore not formal regulations of the Commissioner as was the case in the above cited decisions. Indeed, as the Commissioner herself admits, the guidelines "are not self-executing rules. They are simply guides to official action...As the first of their kind, these guidelines are almost experimental in nature." While there is no doubt that the Commissioner could properly promulgate the guidelines in question,

> if a particular agency pronouncement may be lawfully issued without going through the pro-

[11] The Commissioner runs yet another risk in seeking to wholly insulate her processes from judicial review. If, as the Commissioner seems to be arguing, one were to look only at the actual assessment situation in Fitchburg as a matter of substantive reality, see pp. 36-38 infra, the result would be adverse to the position she advocates. As will be seen, however, a due regard for her statutory responsibilities and the practical problems facing her, results, after necessarily detailed analysis, in upholding her decisions.

cedure of notice and hearing required for a regulation, that pronouncement "does not have the binding force attributable to a full-blown regulation." **Massachusetts Gen. Hosp. v. Rate Setting Commn.**, 371 Mass. 705, 707 (1977). **Cerro Metal Prods. v. Marshall,** 620 F. 2d 964, 981 (3d Cir. 1980).

The weight to be accorded an agency judgment "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. **Skidmore v. Swift & Co.,** 323 U.S. 134, 140 (1944). **Tinkham v. Department of Pub. Welfare,** Mass. App. Ct. Adv. Sh. (1981) 509, 518.

That the guidelines are not formal regulations and are, therefore, entitled to less deference than regulations adopted after appropriate notice and hearing does not, of course, authorize this Court in any way to substitute its judgment for that of the executive officer to whom the legislature has accorded such broad discretion in this area. Indeed, the traditional deference accorded by the judiciary to the legislative and executive branches of government in the area of taxation requires that judicial review be both sensitive to the prerogatives of the legislative and executive branches of government and circumspect in nature. However, it is well said that "the power to tax is...the power to destroy." **Long v. Rockwood,** 277 U.S. 142, 150 (1928) (Holmes, J. dissenting). Accordingly, it seems to this Court that the proper level of review of such an informal, experimental guideline as this is the level of judicial scrutiny that has been adopted by the Supreme Judicial Court for reviewing health and safety regulations. **West Broadway Task Force, Inc. v. Commissioner of the Dept. of Comm. Affairs,** 363 Mass. 745, 752 (1973) (Kaplan, J.).

**Boston v. Massachusetts Port Authy.,** 364 Mass. 639, 663 (1974). **Secretary of Environmental Affairs v. Massachusetts Port. Authy,.** 366 Mass. 755, 771 (1975) (Reardon, J.). It is therefore, with that level of additional judicial scrutiny that this Court will review both the Commissioner's guidelines and her conduct thereunder.

Even under the more detailed judicial review described above however, the Commissioner's guidelines, as written, pass muster. It is important to remember that the guidelines do not prescribe improper assessment. At most, the defendants fear that they permit improper assessment. The analysis must, therefore, proceed to consider what the Commissioner actually did pursuant to her guidelines for, if in fact she required an acceptable level of assessing equity and full and fair cash valuation pursuant to some rational process before certifying Fitchburg and other communities for tax classification, these plaintiffs cannot be heard to complain that the guidelines, as written, could conceivably allow improper assessment practices. See generally, **Smith v. Goguen,** 415 U.S. 566, 577-578 (1974); **Commonwealth v. Gallant,** 373 Mass. 577, 579-581 (1977); **Commonwealth v. Bohmer,** 374 Mass. 368, 371, n.6 (1978); **Commonwealth v. Guest,** Mass. App. Ct. Adv. Sh. (1981) 1632, 1633.

**b. The Validity of the Commissioner's Certification Procedures As Applied**

The Commissioner used her guidelines to determine, for fiscal year 1981, which communities would be certified to implement tax classification. For communities that had revaluation in fiscal years 1979 or 1980 and had been reviewed for certification under the shelf legislation, a study of sales during the nine-month period, January through September, 1979, was performed. For communities that had not been subject to a shelf legislation review, a study of sales during all of calendar year 1979 was, in most instances, undertaken. Fitchburg received a nine-month study, based primarily

upon an analysis of the 3S forms submitted during that period. Unlike the review done in anticipation of implementation of the shelf legislation, this review did not, due to the press of time, attempt to calculate medians and COD's for all classes of property in this city. Nor was there time to perform individualized field assessments to verify the accuracy and uniformity of assessment practices in the commercial and industrial classes. Even the analysis of the 3S forms was not without flaw. It appears that in two instances the same property was double counted and in a third, commercial property was counted as single-family residential property. These irregularities pertain, however,\ at most to approximately three properties in the study and do not materially affect the statistical conclusions derived. The Commissioner's nine-month study of Fitchburg in fact derived median ratios and COD's for only two classes of property, the results being set forth below:

| R 1 | Median Ratio | COD |
|---|---|---|
| (single family | 80% | 11.2 |
| residential) | 55% | 63.7 |
| Land | | |

Looking over her results for land, the Commissioner decided that too few sales of land had been reported on the 3S forms for the nine months' study to be statistically significant. Accordingly, she disregarded the results of the land study. No further study of land parcels was made.

The plaintiffs raise a number of objections to the process thus far. None of them have merit. It was reasonable for the Commissioner to conduct only nine-months studies of those communities which had already been once reviewed under the shelf legislation and which had revalued for fiscal years 1979 and 1980. As these communities were the ones most likely to be certified, it made sense to conduct a nine-month study for them and reserve for the communities less likely to be certified the twelve month study. In this regard the statutory mandate and the Commissioner's limited resources assume controlling significance. A study confined to this nine-month period was necessitated by the need to make certification decisions as expeditiously as possible in calendar year 1980 in order to allow certified communities time within which to implement classification for fiscal year 1981. Since there is a two to three month lag in the reporting of sales on the 3S forms, the Commissioner necessarily had to establish a cut-off point as which time she stopped accumulating data and began to analyze it. Quite simply, this appears to have been the best she could do and this Court will not second-guess that type of decision. **Newton v. Commissioner of Revenue,** Mass. Adv. Sh. (1981) 1659, 1666.

The decision the analyze only R 1 properties is more questionable but, in the circumstances of this case (where R 1 properties constituted 50% of all the parcels of land in Fitchburg) it was reasonable. The Commissioner argues that the low number of sales in the remaining residential classes made reliance on those sales statistically inadvisable and submits that she has discretion to exclude unreliable data from her calculations. This argument, however, misses the mark. Of course she does have the discretion to exclude unreliable data. She did so in the case of land and her decision was reasonable. On the few sales that she had evaluated during the nine-month study, land appeared to have a median ratio of 55%, more than 20% of the 80% residential median ratio. Nevertheless, if, as the Commissioner determined, there were too few land sales to provide reliable statistical data, disregarding them entirely is not a violation of her own guidelines. Rather, it demonstrates that the guidelines are somewhat unworkable given the lack of sales within the land class in Fitchburg during the nine months the Commissioner chose to study. Since the Commissioner had to implement a complex and comprehensive enactment on a statewide basis in time for use during fiscal year 1981 and had over 100 cities

and towns undergoing certification review, this Court will not find fault with her determination to proceed reasonably even though she had no statistically valid results from the nine-month study as to land. Her argument that she could ignore the R 2, R 3, and R 4 classes on the same basis, however, will not wash. It may well be that the nine-month study revealed too few sales in each one of these classes considered individually to be statistically significant. That makes no difference. Her guidelines clearly state that she is going to calculate a median ratio and COD for residential property as a whole. This Court rejects the after-the-fact rationalization that "residential" really means "single-family residential". The guidelines are reasonably plain on this point and they ought have been interpreted in accordance with the plain meaning of the words used. Obviously, the Commissioner thought there were enough sales to compute a valid median ratio and COD for R 1 properties. This being so, she should properly have added in the R 2, R 3, and R 4 arm's-length sales in order to calculate a median ratio and COD for residential property as a whole.

That she failed to do so, and instead, relied on R 1 sales alone is not, however, in the unique circumstances of this case, fatal. Two factors permit the Commissioner to squeak by reversal on this ground. First, "(O)ther use classes are more difficult to appraise with the same accuracy attainable for single-family residences." International Association of Assessing Officers, **Improving Real Property Assessment,** (Chicago, Ill. 1978) at pp. 135-136. This difficulty, coupled with the severe understaffing and time constraints facing the Commissioner, made it reasonable for her to consider evaluating a residential sub-class as representative of the whole. Second, the unique circumstance that, in Fitchburg, R 1 properties represent 50% of all parcels in the city, made it not unreasonable to choose R 1 as representative of all residential properties. The Commissioner could logically reason that the median ratio for all

residential properties would fall not far from the median ratio for R 1 since R 1 properties would necessarily make up the greatest proportion of residential properties by far. There was no logical basis, however, to conclude that the COD for all residential properties bore any relationship to the COD for R 1. The coefficient of dispersion, though, is a measure of intra-class proportionality, or equity in assessment practices. Therefore, the Commissioner could reasonably conclude that, given Fitchburg's good faith attempts at revaluation and the level of assessment equity throughout the large R 1 class, comparable assessment equity existed within each of the R 2, R 3, and R 4 classes notwithstanding whatever disparities might exist between such classes.[12]

The plaintiffs argue strenuously that, whatever the rationality of the Commissioner's choice, it violated the plain meaning of her guidelines and must, therefore, be set aside. This Court having rejected the Commissioner's present contention that "residential" means "single-family residential," she falls back to arguing that she is not bound by her regulations and that, even if she is subject to judicial review, she is safe so long as she acts rationally. This Court has earlier held that Commissioner is bound by her own guidelines and the rationale there set forth is applicable here as well.

(I)t is a fair inference that these detailed and carefully worked out "guidelines" were intended

---

[12] In fact, the Commissioner was wrong. This Court finds that, over the nine-month period studied by the Commissioner, the COD for R 2 was 36.87%, for R 3 was 23.90%, and for R 4 was 33.09%. The logic of her using the R 1 median ratio, however, is demonstrated by noting that for the calendar year 1979, the median ratio for all residential properties was 81.40% as compared to the Commissioner's 80% figure derived from the nine-month study. As discussed **infra,** this Court concludes that the Commissioner was entitled to rely upon her own studies in the absence of any more accurate information. The matter of the Commissioner's responsibility to deal with representations of "reality" more accurate than her own is considered below at pp. 43-44 and n.16.

to have general applicability and were expected to indicate to cities and towns the assessment standards expected of them by the Commissioner within their boundaries. As such, these "guidelines" operate and will be treated by this Court in accordance with their substance, whatever their name.

(T)he issue presently before the Court seems to be whether a consideration of the interests involved dictates that these guidelines also have the force of law with respect to the Department of Revenue. "Violations by Agencies of Their Own Regulations", 87 Har. L. Rev. 629, 630 n.8. See Bergen, **Do Regulations Really Bind Regulators?**, 62 Nw. U.L. Rev. 127, 179 (1967). For three reasons, this Court concludes that the February 11, 1980 guidelines bind the Department of Revenue...First, uniform treatment of persons similarly situated is a basic requirement of justice, K. Llewellyn, **The Bramble Bush**, 43 (1951), see generally K. Davis, **Administrative Law Treatise** §4.17 at 220-221 (Supp. 1970), and it would be unfair to permit the Department of Revenue to depart from its guidelines in the case of Fitchburg where other communities desirous of utilizing tax classification may be similarly situated. Second, the unexplained deviation from the guidelines in the case of Fitchburg may undermine public confidence in the agency's integrity and impartiality. See **United States v. Leahey**, 434 F. 2d 7, 10 (1st Cir. 1970). This is the first known case to arise under the tax classification amendment. It is vital that uniform, consistent procedures be followed in implementing this measure lest ge-

nuine equity of assessment be commercial and industrial taxpayers have a reliance interest in seeing the guidelines in force. **Yellow Transit Freight Lines, Inc. v. United States**, 221 F. Supp. 465, 471 (N.D. Tex. 1963) (Brown, J., concurring) (holding that the Interstate Commerce Commission may not deny shippers the right to serve a neighboring municipality which falls within their commercial zone according to ICC regulations.

**Litton Business Systems, Inc. v. Commissioner of Revenue**, Suffolk Superior Court No. 44824 (Memorandum and Order at pp. 14-19), remanded and vacated for lack of subject matter jurisdiction, Mass. Adv. Sh. (1981) 1207. If the Commissioner is not satisfied with these guidelines, she should revoke or clarify them. It will not do to promulgate guidelines on which both communities seeking certification and taxpayers affected thereby will naturally rely and then disregard them when making the actual decisions involved.

Nevertheless, while her guidelines do bind her, this Court is satisfied that there has been no genuine violation of the guidelines with respect to the determination to use R 1 properties as representative of the entire class of residential property in Firchburg. Rather than disregarding her own guidelines, this Court rules that the Commissioner and her agents attempted in good faith to follow them on this point but, just as was the case with the failure to derive acceptable data relative to land, staffing inadequacies and the pressure of time made it administratively unworkable to actually calculate a median and COD for all residential parcels or for the individual residential sub-classes other than R 1. In short, the Commissioner did the best she could with the small staff and the brief period of time allotted her under the law. This Court will not require more, so long as there has been a good faith attempt to follow the guidelines and no intentional

violation thereof.

Finally, the plaintiffs complain that, as part of the nine-month study, the Commissioner conducted no field appraisals of representative commercial and industrial properties as indicated by her guidelines. The charge is literally true but, in context, immaterial. While it is true that the Commissioner conducted no field appraisals in Fitchburg with specific reference to her nine-month study, she had conducted such appraisals when previously considering Fitchburg for certification pursuant to the shelf legislation study. While these field appraisals had become somewhat dated by the end of 1979 and the first quarter of 1980 (the time during which the nine months' study was conducted), it was reasonable for the Commissioner, in light of all attendant circumstances, to continue to look to these field appraisals to tell her whether general assessing practices in Fitchburg were such that she might certify the city for tax classification.

Ironically, it would appear at first glance that the entire discussion in this section of the opinion is superfluous since no results at all were derived for land from the nine-month study and the results for residential property, using R 1 as the norm, were a coefficient of dispersion or measure of assessment equity of 11.2%, comfortably within the required 15%, but a median ratio a full ten percentage points below the required minimum median ratio for residential land of 90%. Accordingly, on the basis of the nine-month study, the Commissioner determined that Fitchburg was not assessing property at full and fair cash value as of January 1, 1980, and so informed the assessors in a letter dated March 31, 1980. However, on the basis of the statistics for R 1 and land parcels alone, the Commissioner determined that sufficient uniformity of assessment existed in Fitchburg to permit it to be certified to implement classification if it employed "an approved factoring program."

## c. Factoring

Factoring is nothing more than fudging or jimmying the numbers by multiplying assessments by a certain "factor" to bring them up to a constitutionally and statutorily accepted level. This is nothing theoretically invidious or discriminatory about factoring and, given a fair degree of actual assessment equity, it is a reasonable albeit 'quick and dirty' method of achieving full and fair cash value. The major mathematical objection to factoring is that, as one factors, the reliability of your estimators of assessment level and assessment equity (i.e., median ratios and coefficients of dispersion) diminishes appreciably. Factoring numbers which have already been once factored reduces the value of your estimators arithmatically; that is, the consequences of double factoring are equivalent to a single factoring using a multiplier which is the sum of the two multipliers actually used. Thus, at some point the integrity of your assessment estimators is so far reduced as to render them meaningless, invalidating the statistical approach to generalized assessment and requiring a parcel by parcel revaluation.

The plaintiffs' first objection to factoring is that it violates the guidelines. Not so--now, after a full evidentiary hearing, this Court rules that the Commissioner has used factoring with a number of communities and there is not the slightest shred of evidence that Fitchburg was chosen to factor on any arbitrary basis. While it would doubtless be better if the Commissioner's guidelines mentioned factoring and articulated the criteria upon which she would choose to permit it, this Court cannot prescribe a better system so long as the one actually adopted is rational and scrapes by. **Newton v. Commissioner of Revenue**, Mass. Adv. Sh. (1981) 1659, 1666.

Second, the plaintiffs challenge the factoring procedure followed in this case. In this they are correct, though perhaps not in the manner or to the extent they wish.

Having looked at the level of assessment equity in Fitchburg represented by

the coefficient of dispersion for R 1 parcels there, the Commissioner determined that Fitchburg was an appropriate candidate for factoring. This done, she turned from the nine-month study to the 1980 Equalized Valuation Study (1980 EQV Study) to ascertain the level of assessment which she proposed to factor or jimmy up to 100%. The plaintiffs contend that this decision was statistically incomprehensible and, in reality, is arbitrary and irrational. They launch their attack by inquiring into the methodology of the 1980 EQV Study. Here they strike pay dirt. Despite the detailed protocol issued by the Commissioner for the preparation of the 1980 EQV Study, this Court finds, as to Fitchburg at least, that study to have been accomplished in a sloppy and irresponsible manner. The 1980 EQV Study protocol called for sampling by field assessment. None whatsoever was done in Fitchburg specifically for that study. Moreover, proper preparation of the 1980 EQV Study required calculation of a mean assessment to sales ratio for each of ten sub-classes of property within the city. The required analysis was actually performed for only four such sub-classes. The valid results are set forth below:

| Class | No. of parcels | Statistical Sample | Mean ASR |
|---|---|---|---|
| R 1 | 5277 | 410 | 89.6% |
| R 2 | 1683 | 114 | 96.5% |
| R 3 | 724 | 74 | 104.0% |
| L | 1799 | 25 | 82.0% |

The steps followed to complete the remainder of the purported "study" may be simply stated. The agent of the Bureau assigned to Fitchburg simply "rounded off" the mean ASR for R 3 parcels from 104% to 100%, he arbitrarily assigned the seven condominium parcels the mean ASR derived for R 1 parcels (89.6%), assigned the 398 R4 parcels and the 37 A parcels the R 2 mean ASR (96.5%), and established as the mean ASR for the 459 commercial properties, the 124 industrial properties and the 48 residential/commercial properties the median ratio of 100% which had been derived from the shelf legislation study. Thus, of the ten sub-classes which ought have been studied in Fitchburg as part of the 1980 EQV Study, six subclasses received arbitrary measures of assessment level and a seventh had the assessment level derived from calculation "rounded off" to drop four percentage points. This is hardly an acceptable approach to measuring general assessment practices in Fitchburg and no cry of budgetary constraints excuses it.

Nevertheless, this Court holds that the plaintiffs here may not now complain that the Commissioner, in determining whether Fitchburg was eligible for tax classification, might rely on the 1980 EQV Study, flawed though it was. Such a complaint simply comes too late. Equalized valuations determined biennially by the Commissioner pursuant to G.L. c. 58, secs. 10-10C, serve several purposes: as an aid to equalizing the distribution of state financial assistance due to local governments, **Town of Sudbury v. Commissioner of Corps, & Taxn.**, 366 Mass. 558, 561 (1974); in establishing a **prima facie** case of disproportionate assessment, **Tregor v. Assessors of Boston,** Mass. Adv. Sh. (1979) 770, 779-780, **cert. denied,** 444 U.S. 841 (1979); as a mode of determining the municipal average assessment for purposes of property tax abatement, **Kenison v. Assessors of Boston,** Mass. Adv. Sh. (1980) 1485, 1498-1499; and as a mechanism for testing a community's full and fair cash value for purposes of Proposition 2 1/2. **Newton v. Commissioner of Revenue,** Mass. Adv. Sh. (1981) 1659. The results of the 1980 EQV Study represent the only official, statewide determination of valuation in each community in the Commonwealth for fiscal years 1981 and 1982. The

timetable for reporting the final equalization and apportionment, and the method for challenging it, is specifically worked out in G.L. c. 58, secs. 10A-10C, and the attack by the present plaintiffs simply comes too late.[13] In the circumstances of this case, then, this Court is satisfied that the Commissioner might rely upon her equalized valuation figures as accurate (even though they were not) in the absence of any challenge thereto prior to her report to the legislature.

For the record, this Court finds as a factual matter that, as of January 1, 1980, the assessors were not assessing property in Fitchburg at full and fair cash value and that, from the best available data, the actual mean ASR over the eighteen months studied in the 1980 EQV Study, and the actual median ASR and COD as at January 1, 1980, are set forth below:

| Property Class | Mean ASR (18 mo. study) | Median ASR (1/1/80) | COD (1/1/80) |
|---|---|---|---|
| R 1 | 89.1% | 80.7% | 14.8% |
| R 2 | 96.6% | 83.8% | 27.0% |
| R 3 | 103.2% | 87.6% | 22.9% |
| R 4 | 114.4% | 89.8% | 17.5% |
| RC | 80.6% | * | * |

| Property Class | Mean ASR (18 mo. study) | Median ASR (1/1/80) | COD (1/1/80) |
|---|---|---|---|
| C | 118.3% | 77.4% | 28.5% |
| I | 117.2% | * | * |
| L | 82.0% | 77.4% | 41.4% |
| A | * | * | * |
| CD | * | * | * |

*—no statistically acceptable data available

It will be noted that, in actuality, the level of assessment does not conform to the guidelines but, as this Court has already held, the Commissioner is entitled to rely upon her own studies which erroneously indicated compliance. These findings are made in order that an appellate court may have a complete record should it determine, contrary to this Court's opinion, that the actual level of assessments bears on the question of the propriety of permitting tax classification.

Even if the inaccurate levels of assessment reported on the 1980 EQV Study must be taken as valid, however, the plaintiffs are not yet at the end of their string. The plaintiffs fault the Commissioner for switching from data based on the median ASR to older data based on the mean ASR. They point out, correctly, that there is no direct arithmatic relationship whatsoever between medians and means, especially when the data base

[13] While nothing in G.L. c. 58, secs. 10A or 10B expressly confers standing on these plaintiffs of those similarly situated to challenge the equalized valuation and apportionment, the use of such equalized valuations by the commissioner to make the determination whether to certify a community for tax classification (and thus shift a substantial tax burden onto commercial and industrial taxpayers) would seem to so prejudice the substantial rights of such taxpayers or classes of taxpayers, Duato v. Commissioner of Pub. Welfare, 359 Mass. 635, 637-638 (1971) as to make the injury complained of not too remote to warrant conferring standing upon such taxpayers should they complain to the Appellate Tax Board. Compare Doe v. Governor, Mass.Adv.Sh. (1980) 2289, with Shaker Community, Inc. v. State Racing Comm'n., 346 Mass. 213 (1963); Boston Edison Co. v. Boston Redevelopment Authy., 374 Mass. 37, 43-46 (1977); Group Ins. Comm'n. v. Labor Relations Comm'n., Mass.Adv.Sh. (1980) 1743, 1746. Indeed, were these plaintiffs to be denied any forum in which they might challenge the manner of conducting the Equalized Valuation Study (now that we know the important role that study plays in tax classification decisions), it might pose substantial constitutional problems.

is derived from different time periods. Finally, they fault the Commissioner for failing to "time trend" the older data to account for inflation. These arguments are significant and far from frivolous but, upon reflection, none are persuasive.

While it is true that the mean ASR for each property sub-class found in the 1980 EQV Study bears no arithmatic relationship to the median ASR for that sub-class derived from the nine-month study, this is not fatal. The switch was made, not to test conformity with the guidelines—a process which had come to an end upon analysis of the results of the nine months' study; rather the switch was made to the data base found in the 1980 EQV Study in order that there be a uniform approach to factoring throughout the Commonwealth—an approach which, in the case of Fitchburg, might rest upon the study of a larger number of parcels in the R 1 class than was possible in the nine-month study. The plaintiffs are correct in pointing out that the Commissioner could have developed a statistically valid median ASR and COD, from the nine-month study, and could have relied upon the median so developed to institute a factoring program. The problem with this approach, while satisfactory for Fitchburg, is that not all communities had such current data and, therefore, if factoring were to be used, the method of implementing it would have to vary from community to community. The same can be said for "time trending." While time trending is an acceptable statistical device for projecting market trends from the rate of change of means or medians within a studied time period, it necessarily requires some uniform protocol for establishment and approach to the tax rolls of a city or town. As yet, the assessors in the 351 cities and towns of the Commonwealth have developed no uniform method of establishing their tax rolls nor has the Commissioner developed a statewide protocol for time trending. Therefore, while time trending is certainly possible with respect to Fitchburg and, if used, would have permitted a more

accurate evaluation of assessment levels as of January 1, 1980, she is not required to adopt such an approach in light of the fact that, for fiscal year 1981, she was supervising the factoring programs of forty-seven separate communities. What she did was to fashion a normative standard based upon data which (1) could be applied equally to each community and (2) might reasonably have been relied upon by her as sufficient to produce an acceptable data base for factoring. "The Commissioner has made a judgment conceding perfection in result, in favor of a process which is orderly, expeditious, and (which she believed) reliable." Newton v. Commissioner of Revenue, Mass. Adv. Sh. (1981) 1659, 1665-1666. This Court cannot set aside that judgment. Ibid.

The Commissioner determined the factor necessary to raise the R 1 and Land valuations to full and fair cash value by dividing 100% by 89.6% (the mean ASR for R1 as derived from the 1980 EQV Study), producing a factor of 1.12.[14] An attachment to the Commissioner's letter of March 31, 1981 directed the city to raise its R 1 and Land assessments by a minimum factor of 1.12 by multiplying this factor (or, inferentially, a greater factor) to the assessed valuations of all R 1 and Land parcels. On April 4, 1980, Fitchburg returned a form indicating its intention to apply the Commissioner's factoring program.

In fact, the city chose to use a more complex system of factors than that prescribed by the Commissioner. As is frequently the case, its assessment roll and tax bills indicated an assessed value for land and a separately assessed value for buildings on that land. This was true for R 1 parcels in Fitchburg. Believing that they could most accurately factor up by the mandated 1.12 factor, the Assessors multiplied the land portion of each parcel by a factor of 1.10 and the building or structures portion by a factor of 1.13. There is no evidence that this approach,

---

[14] Thus, 89.6% x 1.12 equals 100%.

while not precisely that prescribed by the Commissioner, failed to raise the assessed value of R 1 parcels by the required 1.12 factor. The Assessors also went ahead on their own and factored up R 2, R 3, and R 4 parcels by a factor of 1.06. Using the 1980 EQV Study as the data base from which to factor, the results of the assessors' actions are set forth below.

| Property Class | Mean ASR (1980 EQV Study) | Factor | Factored Mean ASR |
|---|---|---|---|
| R 1 | 89.6% | 1.12 | 100.0% |
| R 2 | 96.5% | 1.06 | 102.3% |
| R 3 | 100.0% | 1.06 | 106.0% |
| R 4 | 96.5% | 1.06 | 102.3% |
| RC | 100.0% | 0 | 100.0% |
| C | 100.0% | 0 | 100.0% |
| I | 100.0% | 0 | 100.0% |
| L | 82.0% | 1.10 | 90.2% |

In August 1980 the Commissioner learned of the manner in which Fitchburg had employed its factoring program. She agreed with it and, on or about September 9, she certified that the city of Fitchburg might implement tax classification.

This Court rules that the factoring program, as implemented by the Assessors and approved by the Commissioner, is improper and must be declared so. As explained above, a factoring program is nothing more than an arithmatic method of fudging the figures up or down to arrive at an acceptable assessment level. Once an acceptable data base from which to factor is established, all that remains is the arithmetic derivation of the factor which will take the sub-class property to 100% and then the multiplication of the assessment of each parcel within that sub-class by the factor derived for the class as a whole. This is a process which is entirely ministerial in nature. It involves no judgment of any sort, and can be accomplished by anyone with a competent elementary school education. This Court does not fault the assessors for breaking down the Commissioner's 1.12 factor into a "land" and a "buildings" component. This may well have been the accurate way to apply that factor to R 1 parcels. However, it is utterly indefensible for the Assessors to have failed to factor land parcels up to 100% and to have applied a factor to R 2, R 3, and R 4 parcels which carried them over 100%.[15] Quite simply, once an appropriate data base has been arrived at through the exercise of experience and expert judgment, then a factoring program, if one is to be used, must factor to 100% with respect to each of the sub-classes established in the working data base. This was not done in the case of Fitchburg and the process actually used must be declared illegal.

One further matter remains before a declaration of the rights of the parties may be entered. It has been established, after full trial on the merits, that the Assessors in Fitchburg were not, as of

[15] On the Assessors' behalf, it may be that they were factoring from a different data base than the 1980 EQV Study. Thus it is possible to argue, although no one has done so, that the factors actually applied by the Assessors more adequately reflect reality than do assessment levels derived from the flawed 1980 EQV Study. In the absence of any evidence on the point, this may explain what otherwise seems inexplicable. Even so, the factoring program actually used by the assessors must be held invalid. It is the responsibility of the Commissioner and the Assessors to establish the vision of "reality" from which such an artificial program as factoring will jump. In this case, it is clear that the commissioner was working from the 1980 EQV Study. This Court has held, albeit not without some reservations, that she was entitled to use this study as her data base. If so, the Assessors were bound to use that same data base. With all the deference paid to the Commissioner throughout this opinion in the use of statewide uniform procedures, the Assessors will now be heard to say that they used some other, more accurate data base from which to factor.

January 1, 1980, assessing property in that city at full and fair cash value and that the assessment levels actually in existence were markedly different from those the Commissioner, despite the good faith exercise of her extensive powers and utilization of her limited resources, believed to be the case. The findings of the Court represent "reality" as of January 1, 1980. The Commissioner cannot ignore this reality in further dealings with the Fitchburg Assessors. Naturally, the manner in which she incorporates this court's factual findings (based as they are on extensive and sophisticated expert testimony supported by detailed computer analysis) is left entirely to her.

In the present instance, it took extensive litigation after-the-fact for the parties to get at an accurate estimation of assessment levels in Fitchburg. Those levels have now been established by the litigation process, no doubt at considerable expense to the plaintiffs for legal fees and expert services. Fitchburg and the Commissioner are, of course, bound by the factual findings of the Court at least as to the situation existing on January 1, 1980.

The point, however, is a more general one. There is little or no professional disagreement over the proper statistical approaches to mass assessment techniques. All parties seem to agree that the accuracy of the results achieved is in direct proportion to the resources expended for computer-aided statistical services and, ultimately, for parcel by parcel revaluation. See, **Newton v. Commissioner of Revenue,** Mass. Adv. Sh. (1981) 1659, 1665. Thus, were these plaintiffs or others similarly situated in other municipalities to present the Commissioner with a statistically valid study of assessments within a particular community, using the same data as that upon which the Commissioner herself relies and keying directly into the statewide procedures and protocols which she uses to approach these issues, then she may not simply ignore it and go her own

way, relying on techniques which are admittedly less sophisticated and accurate. See, **New Boston Garden Corp. v. Board of Assessors of Boston,** Mass. Adv. Sh. (1981) 1023, 1040-1041. This is far from declaring that the Commissioner must hold a hearing concerning the adequacy of any submission relative to mass assessment levels made by interested taxpayers. There is no legislative requirement for any such procedure and it would be unworkable, not to mention an impossible drain upon already limited resources. Nevertheless, it is proper to declare on this record that the Commissioner cannot simply disregard a study prepared at private expense which meets all her technical criteria and is based upon the same raw data that she utilizes and matches her own statewide approach to assessment issues.[16]

---

[16] No doubt it will be the rare test case where private individuals or entities will go to the considerable expense to perform any study approaching the Commissioner's in sophistication and extent. Therefore, most such "studies" can no doubt be dismissed out of hand upon the most casual perusal. What is required of the Commissioner is nothing more than rationality in dealing with the data which comes to her attention. Indeed, in questionable cases she might file a complaint in the nature of bill of discovery, **Wolfe v. Mass. Port Authy,** 366 Mass. 417, 421-422 (1974) and might request that a special master of her choosing be appointed at the expense of the private parties to report to her promptly upon the sufficiency of the proffered statistical study. Such a procedure is necessary since, if the private parties are willing to pay the Commissioner directly to fund an expert of her choosing, such payment would, by statute, go directly into the general fund. G.L.c. 29, sec. 2. Such a procedure could well provide the Commissioner with expert assistance without straining her already slender resources. Once again, this Court is not to be thought to be in any way intimating that such a procedure is mandated. It merely declares that it is irrational for the Commissioner to ignore "reality." Compare generally, the Federal Administrative Procedure Act, especially 5 U.S.C., sec. 553(b), (c) (1976) (and the court procedures cited and discussed in the Note, "Rethinking Regulation: Negotiation as an Alternative to Traditional Rule Making," 94 Harv.L.Rev. 1871, 1884-1885 (1981). Note also the risks of private funding of public functions discussed in Note, "The California Rent-A-

### 4. Declaration of Rights

Pursuant to G.L. c. 231A, the Court declares that the Commissioner and the Assessors are entitled to rely upon the data derived from the 1980 EQV Study and the nine-month study and that the procedures they followed were reasonable and lawful in every respect but one. However, the Court declares that the procedure actually followed by the Commissioner and the Assessors implementing the factoring program for the city of Fitchburg was illegal and improper in that it did not cause each sub-class of property in that city to be factored to 100% of full and fair cash value. Moreover, the Court declares that assessments in Fitchburg were not, in fact, at full and fair cash value as at January 1, 1981 and that, if in the future such data comes to the attention of the Commissioner in a timely manner, she cannot simply ignore it in the discharge of her functions. Finally, the Court declares that it may properly question assessment procedures adopted by the Commissioner which allow for a coefficient of dispersion in excess of 10% for R 1 parcels, which rely on assessment studies covering periods more than two years and six months prior to the assessment date for which the studies are performed, any procedures which permit factoring of assessment data that has previously been twice factored, and any procedures limited to evaluation of the R 1 sub-class standing alone so long as the language of the Bureau of Local Assessment Technical Information Release 80-403, P. 3 continues to read "residential" and not "single family residential".

### 5. Relief Pursuant to G.L. c. 40, sec. 53.

Chapter 40, Section 53 of the General Laws confers upon the Superior Court jurisdiction to "restrain the unlawful exercise or abuse" of a municipality's corporate power when "its officers or agents are about to raise . . . money" in an illegal manner. G.L. c. 40, sec. 53. This section cannot be invoked against the Commonwealth or its officers, **Hodgdon v. Haverhill,** 193 Mass. 406, 407 (1907),

or against a county or its officials. **Selectmen of Hull v. County Commrs. of the County of Plymouth,** Mass. App. Ct. Adv. Sh. (1981) 1275, 1276. See, Nichols, **Taxation in Massachusetts,** 163 (3d ed. 1938). The aim of Section 53 is to furnish a "prompt and effective remedy" to restrain municipalities from raising, borrowing, or expanding money for purposes not authorized by law, and to enable a minority to guard their rights and interests when such unlawful acts are "threatened or in contemplation." **Hodd v. Mayor & Aldermen of Lynn,** 1 Allen 103, 104-105 (1861). The statute is preventive.

> It is neither anticipatory nor retroactive . . . The statute does not authorize . . . the correction of wrongs wholly executed and completed. It is not retroactive and does not include within its words the redress of an evil that is past and gone.

**Fuller v. Trustees of Deerfield Academy,** 252 Mass. 258, 260 (1925). **Adams v. Northbridge,** 253 Mass. 408, 409 (1925). **Morse v. Boston,** 260 Mass. 255, 264 (1927). **Reilly v. Selectmen of Blackstone,** 266 Mass. 503, 511 (1929). **Dealtry v. Selectmen of Watertown,** 279 Mass. 22, 27 (1932). **Howard v. Chicopee,** 299 Mass. 115, 120 (1937). **Amory v. Assessors of Boston,** 310 Mass. 199, 204 (1941). **Sears v. Treasurer & Receiver General,** 327 Mass. 310, 318 (1951). **Lowell v. Boston,** 322 Mass. 709, 733-735 (1948). **East Side Constr. Co., Inc. v. Adams,** 329 Mass. 347, 351-352 (1952). **Lynch v. Cambridge,** 330 Mass. 308, 311 (1953). **Clark v. Mayor of Gloucester,** 336 Mass. 631, 632 (1958). **Carr v. Assessors of Springfield,** 339 Mass. 89, 92-93 (1959). **North v. City Council of Brockton,** 341 Mass. 483, 484 (1960). **Spear v. Boston,** 345 Mass. 744, 746 (1963). **Burke v. Gloucester,** 358 Mass. 211, 214 (1970). But see **Frost v. Belmont,**

---

Judge Experiment: Constitutional and Policy Considerations of Pay-As-You-Go Courts," 94 Harv.L.Rev. 1592 (1981).

6 Allen 152 (1863). Under this statute, then, it is too late for this court to do anything about fiscal year 1981.

As to the taxes for the fiscal year 1982, however, a different story is presented. The Assessors err when they suggest that, since the tax classification certification is biennial, it is too late to stop the fiscal year 1982 tax bills should some impropriety be uncovered. As the Assessors point out, the statute is prospective only but, so long as the wrong alleged is not completed, this court has the full range of its equitable powers to prevent injury.

Here, however, while the plaintiffs' action is timely, while the court manifestly has the power to act, and while a distinct impropriety has been disclosed in the manner in which Fitchburg implemented a factoring program, no relief is warranted under G.L. c. 40, sec. 53 for the simple reason that there has been no injury to these plaintiffs. This is not a class action. The individual plaintiffs before the court are all taxpayers who own commercial or industrial real estate in Fitchburg. Those classes of taxpayers have not been injured by the impropriety in the method of factoring used here.[17]

### 6. Relief Under G.L. c. 60, sec. 98.

Actions to recover back a tax already paid may be maintained in this Commonwealth only pursuant to G.L. c. 60, sec. 98. Since the taxes of the present plaintiffs have not been increased due to the single illegality in the factoring procedure noted above, tax classification has caused them no injury which may be redressed pursuant to this statute. It is admitted, however, that certain "free cash" which ought, pursuant to the then applicable statute, have been applied to reduce the tax rate for fiscal year 1981, has been, instead, expended by the city of Fitchburg contrary to the letal requirement that it be applied against the tax rate. In certain of these actions, the plaintiffs seek to recover so much of their 1981 taxes as would not have had to be paid had the "free cash" been properly applied by the city. The Court finds that these taxpayers have each complied with the necessary statutory prerequisites for commencing such an action. The argument of the defendant City that the action is either too early or too late is frivolous, reducing, as it does, the statute to a nullity. See, **Commonwealth v. Woods Hole, Martha's Vineyard & Nantucket, SS. Authy.**, 352 Mass. 617, 618 (1967).

The most substantial objection to any recovery under this statutory provision is that it is clear that the taxes paid by the plaintiff taxpayers for fiscal year 1981 were not "wholly void." Despite the language of Section 98 itself that "in an action founded on an error or irregularity in the assessment or apportionment of a tax, only the amount in excess of the tax for which the plaintiff was liable shall be recoverable," recent appellate decisions

---

[17] The point is simply made. Even after factoring, the factored mean ASR for land is only 90.02%. The plaintiffs are correct in arguing that the land valuation must be increased to 100%. The factor necessary to accomplish this further increase is 1.11. Applying this factor to the aggregate assessed value of land parcels in Fitchburg ($8,270,280) results in an increase of that valuation by $909,730.80. Obviously, increasing the value of land parcels in Fitchburg would benefit all taxpayers owning parcels not in that class. However, consistency requires a **reduction** in value for the R 2, R 3, and R 4 parcels which, following the Assessors' improper methodology, have been overvalued. The factor necessary to reduce the R 3 parcels to 100% valuation is .94. Applying that factor to the aggregate assessed value of R 3 parcels in Fitchburg ($16,376,750) results in a reduction in valuation of $1,282,605. Thus, before one factors in the necessary reductions which must be made in the aggregate value for R 2 ($39,929,500) and R 4 ($10,360,560), one can see that the required increase in land valuation is more than offset by the necessary decreases in the valuation assigned to R 2, R 3, and R 4. In short, the people who have been hurt by the improper methodology followed by the Assessors are the owners of R 2, R 3, and R 4 parcels. Indeed, as a practical matter, had the Assessors followed the proper factoring program, the plaintiffs in this case would actually pay more taxes since the total assessed value of property in Fitchburg would be reduced and the tax **rate** would have to be adjusted upward accordingly.

appear to limit this statutory remedy to those rare instances where the entire tax is "wholly void." **Sears Roebuck & Co. v. Somerville,** 363 Mass. 756, 757-758 (1973). **Boston v. Second Realty Corp.,** Mass. App. Ct. Adv. Sh. (1980) 369, 371. The plaintiffs spend a great deal of effort trying to distinguish these cases but are unable to do so. It must be quite frankly recognized that, ever since an abatement procedure has existed in the Commonwealth, a taxpayer has been remanded to his abatement remedy rather than permitted to maintain an action under G.L. c. 60, sec. 98.

For all the reasons set forth above, however, this Court considers it appropriate to enter a declaration that the "free cash" in question ought have been applied in accordance with the statutory command. The reasoning is that set forth in **Litton Business Systems, Inc. v. The Commissioner of Revenue,** Suffolk Superior Court No. 44824 (Memorandum and Order at pp. 6-8) remanded and vacated for lack of subject matter jurisdiction but upheld on this point, Mass. Adv. Sh. (1981) 1207, 1212, which findings and rulings are incorporated herein by reference. Indeed, both this Court's opinion and the conclusion of the Supreme Judicial Court that "under St. 1979, c. 151, sec. 12A, free cash available on July 1, 1980 was to be used to reduce the cash levy for fiscal year 1981 rather than fiscal year 1982," Mass. Adv. Sh. (1981) at 1212 (Braucher, J.) were well known to the city in time to correct the second-half fiscal year 1981 tax bills to prevent such an improper levy. The ruling just made is binding on all parties to this litigation, including the city. Thus, to the extent that any of these plaintiffs have properly pursued the abatement remedy available to them pursuant to G.L. c. 59, sec. 59, they ought, upon proof of the payment of their specific taxes, be entitled to an abatement of so much of those taxes as were improperly levied through the failure of the city to properly apply its free cash.

It has been suggested, however, that the

Appellate Tax Board has no jurisdiction over a claim of this sort. A due regard for that administrative agency and its interpretation of its own organic statute compels this court to permit it, in exercise of its primary jurisdiction, to rule upon that point.

However, should it develop that the Appellate Tax Board rules that it has no subject matter jurisdiction over the free cash issue, and should no appeal be taken or should the Supreme Judicial Court uphold that decision, then this Court rules that in the unique circumstances of this case, where abatement procedures are "seriously inadeauate," **Boston v. Second Realty Corp.,** Mass. App. Ct. Adv. Sh. (1980) 369, 371, to the point of being nonexistent, where the violation of law was made known to the municipality not only by this court but by the Supreme Judicial Court prior to completion of the illegal course of conduct, and where the taxpayers have properly complied with all the statutory requisites under both G.L. c. 59, sec. 59 **and** G.L. c. 60, sec. 98, then they are entitled to relief under the latter statute in accordance with the plain meaning of its words. To deny relief entirely in such circumstances would reproach our fundamental concern for due process of law.

**7. Conclusion**

It is for these reasons that this court entered its order on motions and for partial judgment on October 2, 1981. The defendants having rested upon receipt of that order, the case is now at an end and the partial judgment, supplemented by the declaration of rights set forth herein, shall constitute the final judgment in this case.

It is so Ordered.

**William G. Young**
**Justice of the Superior Court**

## ORDER ON MOTIONS AND FOR PARTIAL JUDGMENT

These cases together constitute the second test of taxation of property by a city pursuant to the "Classification Amendment" to the Constitution of the

Commonwealth, part II, c.1, Section 1, art. 4 of the Massachusetts Constitution, as amended by art. 112 of the Articles of Amendment, approved November 7, 1978.

The first such test failed for want of subject matter jurisdiction, Litton Business Systems, Inc. v. Commissioner of Revenue, Mass. Adv. Sh. (1981) 1207, and a general outline of the statutory scheme and the contentions of the present parties may be found there in Litton Business Systems, Inc. v. Commissioner of Revenue, Superior Court, No. 44824 (memorandum and order, January 21, 1981). Pursuant to Standing Order No. 14-80, the Chief Justice has assigned Suffolk No. 47464 to me and I have ordered the Worcester actions consolidated therewith for further proceedings.

Pursuant to Mass. R. Civ. P. 65(b)(2) the hearing on the plaintiffs' Motion for a preliminary injunction has been consolidated with the trial on the merits. Trial commenced on Tuesday, September 15, 1981, and suspended, after seven days of hearing, on Tuesday, September 29, 1981. The plaintiffs have rested their case and all parties have concluded their evidentiary presentation on the "free cash" issue. The defendants have moved to dismiss the plaintiffs' case pursuant to Mass. R. Civ. P. 41(b)(2).

Since the first half of Fitchburg tax bills are due to be mailed not later than Monday, October 5, 1981, (and perhaps over the weekend), it is imperative that a ruling on the pending motions be promptly made. Therefore, following the procedure adopted by the Supreme Judicial Court in Litton, supra at 1209, I enter this order to be followed, at the appropriate time, by a full opinion.

The plaintiffs' motion for injunctive relief is denied. While it appears that the plaintiffs will be able to prove various errors and inconsistencies in the approach adopted by the Commissioner for certifying a community at full and fair cash value, and while there is a reasonable likelihood that the plaintiffs will prove the existence of at least one systematic flaw which must be corrected prospectively by the Commissioner, none of these matters threatens "sufficient irreparable harm to warrant interference with the City's collection of taxes." Litton, supra at 1212.

Since the plaintiffs are entitled to the declaration of rights which they have sought pursuant to G.L. c. 231A, it would be improvident to dismiss these actions and the defendants' motions, pursuant to Mass. R. Civ. P. 41(b)(2) are, accordingly, denied. On the present record, however, the Court is prepared to, and does hereby, declare and rule that the plaintiffs are not entitled to any relief under either G.L. c. 40, Section 53 or G.L. c. 60, Section 98 as to the tax classification aspects of the case.

With respect to the matter of "free cash", the Court reiterates its earlier discussion in the Litton Systems decision, approved by the Supreme Judicial Court on appeal, Litton, supra, at 1212, and rules that those plaintiffs herein who have paid their taxes under protest, and sought to recover, pursuant to G.L. c. 60, Section 98, so much of their property taxes as would not have had to be paid had the free cash been used to reduce the levy for fiscal year 1981 as required by law and have timely filed applications for abatement and pursued their remedy before the Appellate Tax Board pursuant to G.L. c. 59, Section 59, and G.L. c. 58A, Sections 7 or 7A, are entitled to recover that portion of their taxes as would not have been collected had free cash been properly applied, through the abatement and Appellate Tax Board procedure. Since this Court ought defer to the Appellate Tax Board, however, in ascertaining the limits of its own jurisdiction, further proceedings to obtain repayment of the taxes wrongfully collected on account of the improper use of "free cash" shall be stayed. Should the Appellate Tax Board determine that it is beyond its jurisdiction to entertain such claims, the plaintiffs who have met the required statutory prerequisites of

payment under protest, filing and pursuing an application for abatement, and commencing an action under G.L. c. 60, Section 98, are entitled to recover under that provision and this Court will retain jurisdiction for that purpose.

It is so órdered.

BY THE COURT,
**William G. Young**
**Justice of the Superior Court**